*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0240p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

> *Plaintiff-Appellee,*

v.

CARL PEARCE (07-3146), and CURTIS JOHNSON
(07-3193),

> *Defendants-Appellants.*

Nos. 07-3146/3193

>

---

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 05-00120—Donald C. Nugent, District Judge.

Submitted: June 5, 2008

Decided and Filed: July 3, 2008

Before: DAUGHTREY, CLAY, and McKEAGUE, Circuit Judges.

---

## COUNSEL

**ON BRIEF:** John B. Gibbons, LAW OFFICES, Cleveland, Ohio, Charles E. Fleming, FEDERAL PUBLIC DEFENDER'S OFFICE, Cleveland, Ohio, for Appellants. Kelly L. Galvin, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee.

---

## OPINION

---

CLAY, Circuit Judge. In this consolidated appeal, Defendants, Carl Pearce ("Pearce") and Curtis Johnson ("Johnson"), challenge, on Fourth Amendment grounds, their convictions for possession of firearms and ammunition while having previously been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1) (2000). In particular, Defendants contest the district court's denial of their motions to suppress evidence seized following a stop of Johnson for which the police allegedly lacked reasonable suspicion. Pearce also disputes the procedural reasonableness of his 235-month sentence. For the reasons that follow, we **AFFIRM** the district court's suppression ruling as well as Defendants' convictions and sentences.

## I. BACKGROUND

On January 14, 2005, officers from the Cleveland Police Department ("CPD") and the Cleveland Metropolitan Housing Authority ("CMHA") were conducting a special detail in the area

1

surrounding the Woodhill Family Homes Estates and the Morris Black Estates, housing projects in northeast Cleveland. In particular, the officers were targeting the streets surrounding the Mount Carmel Deli (the "Deli"), a delicatessen located at 11007 Mt. Carmel Street. This special detail was intended to address a recently increased level of criminal activity–particularly narcotics trafficking–in the area, which had been evidenced by a homicide shooting near the Deli a few days earlier.

At approximately 8:15 p.m. that evening, Johnson, accompanied by a passenger, Pearce, parked a white Ford Taurus on the south side of Mt. Carmel Street, across from the Deli. Shortly thereafter, Officer Paul Shaughnessy ("Shaughnessy"), a fifteen-year veteran of the CMHA, initiated the planned police sweep by pulling onto Mt. Carmel Street and parking his marked police cruiser in the middle of the street, a little behind where the Taurus had been parked. While Officer Shaughnessy was parking and exiting from his cruiser, he observed Pearce leaning slightly forward in the passenger seat of the Taurus while Johnson exited the vehicle on the driver's side. As soon as Johnson stepped out of the car, "he turned and he faced toward [Officer Shaughnessy], and he kind of hunched over a little bit, and he stuck his right hand into to the small of his back at his waistline, and then he started backing up, started backing up away from [Officer Shaughnessy], . . . toward the front of his car." J.A. at 226. According to Officer Shaughnessy, "it appeared as though [Johnson] was trying to pull something out, or put something in his pants." J.A. at 74. Fearing that Johnson might have a weapon, Officer Shaughnessy immediately drew his own gun and ordered Johnson to show his hands and walk toward the police cruiser.

During this time, other CPD officers, including Officer Daniel Svoboda ("Svoboda"), had arrived on the scene and had begun to move toward the Taurus to assist Officer Shaughnessy. When Johnson failed to comply with several of Officer Shaughnessy's verbal requests to show his hands, Officer Svoboda also drew his gun and advanced toward Johnson. Officer Svoboda observed that, instead of complying with Officer Shaughnessy's instructions, Johnson was "reaching behind his back," J.A. at 270, where it "appeared he was holding something down out of his back or hands." J.A. at 118. Once Officer Svoboda drew his weapon, Johnson complied with the request to show his hands and moved toward Officer Shaughnessy who began to frisk Johnson in search of weapons. From this protective pat-down of Johnson, Officer Shaughnessy recovered nine small plastic bags containing marijuana.

As Officer Shaughnessy was conducting his pat-down of Johnson, Officer Svoboda walked towards the now empty Taurus.[1] Looking through the passenger's side window, Officer Svoboda saw "a magazine or clip from a gun laying on the passenger floorboard" in plain view. J.A. at 272. At that point, Officer Svoboda immediately shouted "gun." Upon hearing this warning, Officer Shaughnessy placed handcuffs on Johnson and other officers detained Pearce who was still in the immediate vicinity of the Taurus. Officer Svoboda and other CPD officers then searched the Taurus. Their search uncovered a Hi-Point 9mm pistol with seven rounds of ammunition underneath the passenger seat, as well as crack cocaine, a Bryco 9mm pistol, and twelve rounds of ammunition between the driver's seat and the middle console of the vehicle.

While still being detained by Officer Shaughnessy, Johnson voluntarily informed the officer that he was the owner of one of the guns. Johnson again confirmed that he possessed the Bryco firearm in a subsequent interview with Agent Christopher Arone from the United States Bureau of Alcohol, Tobacco, and Firearms. Pearce never admitted to ownership of either weapon.

---

[1]By now, Pearce had exited the Taurus. However, as the police officers were focused on Johnson because of his odd behavior when exiting the vehicle, the record does not clearly indicate at what precise point in time Pearce got out of the Taurus.

Based upon the firearms discovered during the search of the Taurus, on March 9, 2005, Defendants were charged in the United States District Court for the Northern District of Ohio with one count each of being a convicted felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1). On June 9, 2005, Pearce filed a motion to suppress evidence. On December 16, 2005, Johnson filed a motion to suppress all evidence which the law enforcement officers had obtained as a result of their stop of him and their subsequent search of the Taurus. After conducting an evidentiary hearing, the district court denied these motions on August 1, 2006.

On December 4, 2006, the case proceeded to a jury trial. At the conclusion of the evidence, Defendants again requested the district court to suppress the evidence obtained following the allegedly unconstitutional stop of Johnson. These motions, like their previous ones, were denied. The jury subsequently convicted Defendants of the felon in possession charges.

On January 31, 2007, the district court held Defendants' sentencing hearing. The district court found both Defendants to be armed career criminals, and thus required to serve a minimum of fifteen years imprisonment pursuant to 18 U.S.C. § 924(e). With respect to Johnson, the district court noted that the advisory United States Sentencing Guidelines (the "Guidelines") range was 188 to 235 months. With respect to Pearce, the district court calculated the advisory Guidelines range to be 235 to 293 months. After considering arguments raised by Defendants, as well as the specific characteristics of each of them, the district judge sentenced Johnson to 188 months imprisonment, followed by five years of supervised release, and sentenced Pearce to 235 months imprisonment, followed by five years of supervised release.

On February 1, 2007, Pearce filed a timely notice of appeal. Shortly thereafter, on February 12, 2007, Johnson filed his notice of appeal. The appeals were subsequently consolidated as they involve the same general issues of law and fact.

## II.  DISCUSSION

On appeal, Defendants challenge the district court's denial of their motions to suppress the evidence obtained following the police officers' initial stop of Johnson. Specifically, Defendants argue that, because the officers lacked either reasonable suspicion or probable cause for this stop, it was unlawful under the Fourth Amendment, and thus any evidence obtained as a result of the stop and the subsequent search of the Taurus must be suppressed. Additionally, Pearce claims that the district court abused its sentencing discretion by imposing his 235-month sentence without addressing the sentencing factors set forth in 18 U.S.C. § 3553(a). We find both of these arguments to lack merit and accordingly affirm Defendants' convictions and sentences.

### A.  Denial of Motion to Suppress

#### 1.  Standard of Review

On appeal of a district court's ruling on a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions *de novo. United States v. Moon*, 513 F.3d 527, 536 (6th Cir. 2008). Whether a search was reasonable under the Fourth Amendment is a question of law which is reviewed *de novo. United States v. Blair*, 524 F.3d 740, 747 (6th Cir. 2008); *see Ornelas v. United States*, 517 U.S. 690, 691 (1996) (holding that "the ultimate questions of reasonable suspicion and probable cause to make a warrantless search should be reviewed *de novo*"). When a district court has denied the motion to suppress, we must "consider the evidence in the light most favorable to the government." *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004) (en banc).

## 2. Analysis

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "A warrantless search or seizure is '*per se* unreasonable under the Fourth Amendment–subject only to a few specifically established and well-delineated exceptions.'" *United States v. Roark*, 36 F.3d 14, 17 (6th Cir. 1994) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). The Supreme Court has identified three types of reasonable, and thus permissible, warrantless encounters between the police and citizens: (1) consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked questions; (2) a temporary involuntary detention or *Terry* stop which must be predicated upon "reasonable suspicion;" and (3) arrests which must be based upon "probable cause." *United States v. Alston*, 375 F.3d 408, 411 (6th Cir. 2004) (quoting *United States v. Bueno*, 21 F.3d 120, 123 (6th Cir. 1994)).

The second of these exceptions was first spelled out by the Supreme Court in *Terry v. Ohio*, 392 U.S. 1 (1968), where it held that "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry*, 392 U.S. at 30). To determine whether a particular stop is permissible under the Fourth Amendment, a court "must look at the 'totality of the circumstances' of [the] case to see whether the detaining officer has a 'particularized and objective' basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id.* (quoting *Cortez*, 449 U.S. at 418); *see also Ornelas*, 517 U.S. at 699 (noting that appellate courts must "give due weight to inferences drawn from [the] facts by resident judges and local law enforcement"). While an "officer must be able to articulate more than an inchoate and unparticularized suspicion or 'hunch' of criminal activity" in order to justify a investigatory stop, *Wardlow*, 528 U.S. at 123-24 (internal quotation marks omitted), "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Arvizu*, 534 U.S. at 274 (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

After detaining a person for a *Terry* stop, the officer may conduct a "reasonable search for weapons . . . where he has reason to believe that he is dealing with an armed and dangerous individual." *Terry*, 392 U.S. at 27. However, in order to arrest the person or to conduct a subsequent search of the person's vehicle or packages, the officer must have "probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). "Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that an offense has been committed." *Henry v. United States*, 361 U.S. 98, 102 (1959); *accord Beck v. Ohio*, 379 U.S. 89, 91 (1964); *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949); *Logsdon v. Hains*, 492 F.3d 334, 341 (6th Cir. 2007). "Whether probable cause exists depends on the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck*, 543 U.S. at 152.

In order to deter law enforcement officials from violating the Fourth Amendment by stopping persons without reasonable suspicion or by arresting them without probable cause, the Supreme Court has directed that "all evidence obtained by an unconstitutional search and seizure [is] inadmissible in federal court regardless of its source." *Mapp v. Ohio*, 367 U.S. 643, 654 (1961); *see also Weeks v. United States*, 232 U.S. 383 (1914) (establishing the exclusionary rule). This exclusionary rule is supplemented by the "fruit of the poisonous tree" doctrine, which bars the admissibility of evidence which police derivatively obtain from an unconstitutional search or

seizure.  *See Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920).  However, in order to exclude evidence under these constitutional doctrines, the defendant must show more than "the mere fact that a constitutional violation was a 'but-for' cause of [the police's] obtaining [the] evidence." *Hudson v. Michigan*, 547 U.S. 586, 592 (2006).  "[B]ut-for causality is only a necessary, not sufficient condition for suppression." *Id.*  "Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* (quoting *Wong Sun*, 371 U.S. at 487-88 (internal quotation marks omitted)).

In the instant case, we find that Johnson was not unreasonably seized in violation of the Fourth Amendment.  As a preliminary matter, we note that Pearce does not have standing under the Fourth Amendment to challenge Officer Shaughnessy's initial stop of Johnson.  The Supreme Court has found that "'Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.'" *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978) (quoting *Alderman v. United States*, 394 U.S. 165, 174 (1969)).  "In order to qualify as a person aggrieved by an unlawful search and seizure one must have been a victim of a search or seizure, one against whom the search was directed, as distinguished from one who claims prejudice only thorough the use of evidence gathered as a consequence of a search or seizure directed at someone else." *Id.* at 134-35 (internal quotation marks omitted) (emphasis altered); *see also Minnesota v. Carter*, 525 U.S. 83, 88 (1998) ("[I]n order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he *personally* has an expectation of privacy in the place searched, and that his expectation is reasonable." (emphasis added)).  As Pearce himself was not seized or detained in any manner during Officer Shaughnessy's initial stop of Johnson, he has no standing under the Fourth Amendment to challenge the lawfulness of that stop.  While Pearce would have standing to challenge his own arrest, and possibly the police's subsequent search of the Taurus, for lack of probable cause, he has failed to do so.  Moreover, even if Pearce had brought such a challenge, it would lack merit.  After Officer Svoboda observed a gun magazine in plain view on the passenger-side floorboard of the car which Pearce had just exited, the police clearly had probable cause to arrest Pearce and to search the vehicle.  Accordingly, we affirm the district court's denial of Pearce's motion to suppress.

While Johnson's motion to suppress does not suffer from a standing deficiency like Pearce's motion, we find that it was nevertheless appropriately denied on its merits.[2]  Officer Shaughnessy's

_____

[2]As an initial matter, we note that Johnson's suppression argument seems to be somewhat misguided.  Johnson focuses exclusively upon the legality of the stop by Officer Shaughnessy.  However, the only evidence actually derived from this stop were the bags of marijuana found on Johnson's person during Officer Shaughnessy's protective pat-down–evidence that is irrelevant for the purpose of determining whether Johnson had possessed a firearm as a previously convicted felon, in violation of 18 U.S.C. § 922(g).  Johnson appears to presume that, under the "fruit of the poisonous tree" doctrine, the legality of the officers' subsequent search of the Taurus, which uncovered the relevant firearms evidence, is dependent upon the initial legality of Officer Shaughnessy's stop.  Yet, as noted above, the "fruit of the poisonous tree" doctrine only precludes the admission of evidence that "has been come at by exploitation of [the] illegality" of the search or seizure. *Hudson*, 547 U.S. at 592 (quoting *Wong Sun*, 371 U.S. at 488).  In the instant case, the police did not obtain the firearms evidence as a result of Officer Shaughnessy's stop of Johnson, but rather because of Officer Svoboda's separate observation of a gun magazine laying in plain view on the passenger side floorboard of the Taurus.  While it might be argued that Officer Svoboda would never have looked in the Taurus but for Officer Shaughnessy's stop of Johnson, such but-for causality is not sufficient to trigger the exclusionary rule. *See Hudson*, 547 U.S. at 592.  On the contrary, Officer Svoboda's observation of the gun magazine as he walked by the Taurus–something which he arguably would have done anyway, as part of his sweep of the area, regardless of Officer Shaughnessy's stop of Johnson–seems to constitute a means of discovery "sufficiently distinguishable to be purged of the primary taint" of Officer Shaughnessy's allegedly illegal stop. *Id.* (quoting *Wong Sun*, 371 U.S. at 488).  Nevertheless, we need not reach this "fruit of the poisonous tree" issue to resolve this case because we find that Officer Shaughnessy's stop of Johnson was permissible under the Fourth Amendment.

brief investigatory detention of Johnson[3] was permissible under the Fourth Amendment because, in light of the totality of the circumstances, Officer Shaughnessy had an objectively reasonable suspicion that "his safety or that of others was in danger." *Terry*, 392 U.S. at 27. When Officer Shaughnessy entered a known high-crime area in his marked police cruiser, he observed Johnson exit a vehicle, glance towards him, hunch over, place his right hand in the small of his back, and start backing away. Based on his "own experience and specialized training," *Arvizu*, 534 U.S. at 273, Officer Johnson reasonably suspected that "Johnson had a weapon and was getting ready to fire." J.A. at 75-76. Indeed, even from a layman's perspective, Johnson's behavior, while susceptible of an innocent explanation–Johnson may have simply been trying to put his wallet away–might also have been reasonably viewed as an attempt to conceal a weapon and/or other contraband material, such as narcotics, from a police officer who had just appeared on the scene. *See Arvizu*, 534 U.S. at 277 ("A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct."). When combined with the fact that Johnson was engaged in such behavior in an area known for criminal activity and on a street where a crime-related homicide had recently occurred, Officer Shaughnessy's observations provided a sufficient basis for temporarily detaining Johnson to determine whether or not he was actually engaged in wrongdoing. *See*, *e.g.*, *United States v. Paulette*, 457 F.3d 601, 606 (6th Cir. 2006) (finding that "the officers had a reasonable suspicion that [the defendant] was engaged in criminal activity based upon his hand movements consistent with drug-dealing activity, efforts to evade the police upon noticing them, and presence in a high crime area"); *see also Wardlow*, 528 U.S. at 124 (noting that, while an "individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime," police "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation").

The cases cited by Johnson in support of his contention that Officer Shaughnessy lacked reasonable suspicion are inapposite. In *United States v. Patterson*, we found that police officers lacked reasonable suspicion for a *Terry* stop of the defendant when, acting on an anonymous tip from a drug hotline, they went to a particular street corner and observed the defendant's companion throw an object away after seeing the officers approaching. 340 F.3d 368, 370-72 (6th Cir. 2003). In reaching our conclusion in that case, we emphasized that the officers there lacked an individualized suspicion that *the defendant* was engaged in wrongdoing. *See id*. at 372. Unlike the officers in *Patterson*, however, Officer Shaughnessy did not stop Johnson because of the activities of other persons in the same general area, but rather because of Johnson's own hunching forward and hand-placement which reasonably suggested that he might be carrying a weapon.

In *United States v. Baldwin*, we found that the police lacked reasonable suspicion to detain the defendant when the police heard gunshots in a particular area, briefly followed an individual fleeing from that area, and then came across the defendant in his car after losing the trail of the fleeing individual. 114 F. App'x 675, 679-81 (6th Cir. 2004) (unpublished). In reaching that conclusion, we noted that "[e]ven if the fleeing pedestrian may have been involved in the shooting incident, as the Government contends, there has been no showing of any specific, articulable facts which gave rise to a reasonable suspicion that [the defendant] was connected to the firing of the gunshots." *Id*. at 680. The instant case, however, is quite distinguishable. As opposed to the record in *Baldwin*, where the only evidence suggesting that the defendant was involved in criminal activity was his presence in an area near a crime scene, the testimony in this case demonstrates that not only

---

[3]The government appropriately does not dispute that Officer Shaughnessy's drawing of his gun and his instruction to Johnson to "raise his hands" constitutes a stop under *Terry*. *See Brendlin v. California*, 127 S. Ct. 2400, 2405 (2007) ("A person is seized by the police and thus entitled to challenge the government action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement." (internal quotation marks omitted)).

was Johnson in a high-crime area, but that he was also acting in a way suggestive of his carrying of a gun.

In summary, we conclude that Officer Shaughnessy had reasonable suspicion to stop Johnson for a brief investigatory detention and to conduct a protective pat-down to ensure that Johnson was not carrying any weapons. As this stop was lawful under the Fourth Amendment, we hold that any evidence discovered by the police while conducting it or as a potential result of it–*i.e.*, the firearms evidence uncovered during the police's subsequent search of the Taurus–was properly not suppressed by the district court.[4] Accordingly, we affirm the district court's denial of Johnson's motion to suppress.

## B. Procedural Reasonableness of Pearce's Sentence

### 1. Standard of Review

We "review a district court's sentencing determination, 'under a deferential abuse-of-discretion standard,' for reasonableness." *United States v. Lalonde*, 509 F.3d 750, 769 (6th Cir. 2007) (quoting *Gall v. United States*, 128 S. Ct. 586, 591 (2007)). This reasonableness review contains procedural and substantive components. *See Gall*, 128 S. Ct. at 597; *United States v. Bolds*, 511 F.3d 568, 579 (6th Cir. 2007). With respect to the procedural component of sentencing, our task is to "ensure that the district court: (1) properly calculated the applicable advisory Guidelines range; (2) considered the other § 3553(a) factors as well as the parties' arguments for a sentence outside the Guidelines range; and (3) adequately articulated its reasoning for imposing the particular sentence chosen, including any rejection of the parties' arguments for an outside-Guidelines sentence and any decision to deviate from the advisory Guidelines range." *Bolds*, 511 F.3d at 581; *see also Gall*, 128 S. Ct. at 597 (directing appellate courts to "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence – including an explanation for any deviation from the Guidelines range"). Only after we have completed this task and have determined that the district court committed no significant procedural error do we then consider any challenges raised regarding the substantive reasonableness of the defendant's sentence. In evaluating the substantive aspect of a sentence, we may apply a rebuttable presumption of reasonableness to sentences within the Guidelines. *See Gall*, 128 S. Ct. at 597; *Bolds*, 511 F.3d at 581. We also "give 'due deference' to the district court's conclusion that the sentence imposed is warranted by the § 3553(a) factors." *Bolds*, 511 F.3d at 581 (quoting *Gall*, 128 S. Ct. at 597).

### 2. Analysis

Upon review of the sentencing transcript in this case,[5] we find that the district court did not commit any "significant procedural error." *Gall*, 128 S. Ct. at 597. Contrary to what Pearce suggests, the district court explicitly recognized at the outset of the sentencing hearing that, while

---

[4] As we have already noted, we are not convinced that the firearms evidence uncovered during the police officer's search of the Taurus is the fruit of their stop of Johnson. *See supra* note 2. However, even if such a search is properly viewed as derivative of Officer Shaughnessy's stop of Johnson, we note that the search would be justified by probable cause. Once Officer Svoboda observed a gun magazine lying in plain view in the vehicle, the officers had sufficient justification to search the vehicle for weapons.

[5] Pearce's sentencing "arguments" in this case have provided us with little guidance as to which, if any, procedural errors the district court committed when sentencing him. Rather than pointing to any specific errors made by the district court at sentencing, Pearce's appellate brief consists primarily of a discussion of post-*Booker* sentencing law without any explanation of how the facts in this case demonstrate a violation of such law.

it would need to calculate the advisory Guidelines range for each defendant, it would not be bound by that range and would, in fact, be required to consider the other § 3553(a) factors when crafting a sentence. The district court then proceeded to calculate Pearce's advisory Guidelines range as 235 to 293 months, at which point it noted that Pearce was an armed career criminal, pursuant to 18 U.S.C. § 924(e), and thus statutorily required to serve at least fifteen years imprisonment. After calculating the advisory Guidelines range, the district court heard arguments from Pearce's attorney who asked the court to consider Pearce's family background, the other § 3553(a) factors, and the potential longevity of the sentence. The district judge then explained to Pearce that, pursuant to recent Supreme Court cases, he had discretion to impose a sentence outside of the Guidelines, but that "there is a strong argument that a Guidelines sentence is fair and appropriate." J.A. at 444. Next, the court considered Pearce's unique circumstances, emphasizing in particular his extensive criminal background. Finally, the district court sentenced Pearce to 235 months imprisonment, followed by five years of supervised release, the lowest term recommended by the Guidelines.

This record does not reveal any significant procedural errors. The district judge correctly calculated the applicable advisory Guidelines range, listened to the arguments presented by Pearce, and responded with an explanation of why he felt the Guidelines provided an appropriate sentence for Pearce. While the district court did not explicitly name the particular § 3553(a) factors he was considering when imposing Pearce's sentence, the record does not demonstrate that he failed to consider them. Rather, the record reflects that the district court, well-aware of its sentencing discretion, thoughtfully exercised that discretion to impose a sentence at the lower end of the advisory Guidelines range. Pearce has offered no credible argument to suggest that the district court simply ignored the other § 3553(a) factors and blindly applied a Guidelines sentence. Pearce has likewise failed to challenge the substantive reasonableness of his sentence. Accordingly, we hold that the district court did not abuse its sentencing discretion in Pearce's case.

## III. CONCLUSION

For the foregoing reasons, the convictions and sentences imposed by the district court are **AFFIRMED**.