NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0428n.06

No. 09-3856

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Jun 28, 2011*

LEONARD GREEN, Clerk

UNITED STATES OF AMERICA,                    )
                                             )        ON APPEAL FROM THE
          Plaintiff-Appellee.                )        UNITED STATES DISTRICT
                                             )        COURT FOR THE
v.                                           )        NORTHERN DISTRICT OF
                                             )        OHIO
JAMES W. SMITH,                              )
                                             )                O P I N I O N
          Defendant-Appellant.               )


BEFORE:    COLE, McKEAGUE, and GRIFFIN, Circuit Judges.

**McKeague, Circuit Judge.** James W. Smith pleaded guilty to being a felon in possession of a firearm after the district court denied his motion to suppress evidence. The evidence that Smith sought to suppress, a firearm, was recovered by police officers who searched Smith during the course of their investigation of a possible domestic dispute. Smith now appeals the district court's ruling on the motion to suppress, arguing that the officers lacked a reasonable suspicion that he was engaged in criminal activity. Because the totality of the circumstances support the officers' decision to search Smith, we **AFFIRM** the district court's decision.

## I. Background

At approximately 3:00 p.m. on January 20, 2009, Sergeant Gregory Drew of the Cleveland Metropolitan Housing Authority ("CMHA") police department was viewing the video feed from a surveillance camera that was located in the courtyard of a public housing complex. The video

(without sound) showed Smith and a woman, Shaquana Banks, engaged in an argument. Smith never struck Banks, but he aggressively grabbed her and prevented her from walking away on several occasions. Concerned that the argument might escalate, Drew radioed for officers to respond to the location.

The first two responding officers were Detective Clinton Ovalle and Officer Daniel Gomillion. At the time of the incident, Ovalle had been with the CMHA police department for nine years, and in his experience, the housing complex was a place where homicides, shootings and drug activity were relatively common through all hours of the day. Gomillion, despite having only patrolled the area for about a month before the incident, was aware of several homicides, shootings and approximately twenty robberies with handguns in the area during that time. When both officers arrived, they found that Smith and Banks were still engaged in an argument. When the officers were 50-70 yards away, they believe that Smith made eye contact with them, immediately stopped arguing, and directed Banks to walk away with him in the opposite direction of the officers.

The officers pursued the individuals, who then turned a corner outside of the courtyard, where they were briefly out of sight. Approximately 14 seconds later, the officers turned the same corner, but the subsequent events are somewhat unclear. At the suppression hearing, Ovalle first testified that when he turned the corner he saw Smith receiving keys from Banks, and then Smith began to run to an apartment building where, once Smith stepped in the door, Ovalle ordered Smith to stop. Later, Ovalle testified that when he broke around the corner he saw Smith receiving the keys and immediately ordered him to stop, and then Smith ran toward the apartment building. The district

court found that Ovalle's testimony on this issue was "unpersuasive," and that it was most likely that Smith was already at the apartment building door when the officers turned the corner.

In any event, it is clear that Smith ran up three flights of stairs ahead of the pursuing Ovalle and Gomillion. Ovalle reached the top of the stairs first with his taser drawn, where he observed Smith trying to use keys to access an apartment. Gomillion was on Ovalle's heels and had his firearm drawn. Ovalle reported that he told Smith to stop and that he saw Smith make a "furtive movement to his waistband," as Smith was facing away from him. R. 40, Suppression Hearing Tr., at 39. Although his view was partially obstructed by Ovalle, Gomillion reported that he also noticed arm movement that "looked to be [Smith] diving for his waistband." *Id*. at 77–78. Ovalle quickly jumped to detain Smith, as Gomillion provided cover, and Smith was apprehended and handcuffed. Ovalled testified that he grabbed Smith because "he was either – well, the least concern is that he was concealing narcotics, but at the most is that he was grabbing a weapon." *Id*. at 41. At this time Banks was coming up the stairs, yelling and screaming as the officers took Smith downstairs and outside the apartment building. Once outside, Ovalle sent out a radio call advising the other officers of his location and that he was with Smith. Ovalle then frisked Smith, starting with the area that Smith was reaching toward, where he immediately noticed an object that felt like a handgun. Ovalle removed the firearm and placed Smith under arrest.

A federal grand jury returned an indictment charging Smith with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Smith filed a motion to suppress any evidence, including the firearm and any statements made by Smith, that was recovered in the process of handcuffing and searching him. R. 21, Motion to Suppress. Following a suppression hearing, the

district court issued an order denying the motion to suppress. R. 25, Order Denying Motion to Suppress. Smith then pleaded guilty to the charge, reserving the right to appeal the district court's ruling on the motion to suppress. R. 29, Plea Agreement. Smith was sentenced to 48 months imprisonment, and this appeal followed.

## II. Analysis

### A. Standard of Review

When reviewing a district court's decision on a motion to suppress, we conduct *de novo* review of the court's legal conclusions, and clear error review of the court's findings of fact. *United States v. Davis*, 514 F.3d 596, 607 (6th Cir. 2008). The ultimate question of whether a police officer had a reasonable suspicion that would permit the brief seizure of a suspect is a question of law. *United States v. Hudson*, 405 F.3d 425, 431 (6th Cir. 2005) (citations omitted). "A factual finding will only be clearly erroneous when, although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Adams*, 583 F.3d 457, 463 (6th Cir. 2009) (citation and internal quotation marks omitted). We review the evidence as a whole "in the light most likely to support the district court's decision." *Id*. Further, "we accord considerable deference to the credibility findings of the trial court." *United States v. McCauley*, 548 F.3d 440, 447 (6th Cir. 2008). "With regard to *Terry*-stop analysis in particular, although the standard of review on the ultimate reasonable suspicion inquiry is *de novo*" we give due weight "to the inferences drawn from the facts by resident judges," because "the district court is at an institutional advantage, having observed the testimony

of the witness and understanding local conditions, in making this determination." *United States v.*

*Foster*, 376 F.3d 577, 583 (6th Cir. 2004) (citations omitted).

## B. The Fourth Amendment and *Terry*

The Fourth Amendment gives the people the right to be secure against unreasonable searches

and seizures. U.S. Const. amend. IV. Where evidence is recovered as a result of an unreasonable

search and seizure, the Supreme Court has adopted "an exclusionary rule that, when applicable,

forbids the use of improperly obtained evidence at trial." *Herring v. United States*, 129 S. Ct. 695,

699 (2009). Beginning with *Terry v. Ohio*, the Supreme Court has explained that it is permissible

for a police officer, who has a reasonable and articulable suspicion that a person is involved in

criminal activity, to conduct an investigatory stop of that individual. 392 U.S. 1, 21–22, 30 (1968);

*see also Foster*, 376 F.3d at 584–86. As part of the investigatory stop, an officer who "has reason

to believe that he is dealing with an armed and dangerous individual" may conduct a reasonable

search, often called a *Terry* frisk, of the individual, for the safety of the officer and those in the area.

*Terry*, 392 U.S. at 27. Thus, two conditions must be met for a *Terry* stop and frisk to be lawful:

> First, the investigatory stop must be lawful. That requirement is met in an on-the-
> street encounter, *Terry* determined, when the police officer reasonably suspects that
> the person apprehended is committing or has committed a criminal offense. Second,
> to proceed from a stop to a frisk, the police officer must reasonably suspect that the
> person stopped is armed and dangerous.

*Arizona v. Johnson*, 129 S. Ct. 781, 784 (2009). The decision to conduct a *Terry* stop must be based

on "specific reasonable inferences which [the officer] is entitled to draw from the facts in light of

his experience," rather than a "hunch" or "unparticularized suspicion." *Terry*, 392 U.S. at 27. The

proper focus for the Court is on the totality of the circumstances, which includes the articulable

reasons and particularized and objective basis that the officer provides for suspecting an individual

of criminal activity. *United States v. Wilson*, 506 F.3d 488, 492 (6th Cir. 2007). "Pertinent

circumstances include the officer's own direct observations, dispatch information, directions from

other officers, and the nature of the area and time of day during which the suspicious activity

occurred." *United States v. Campbell*, 549 F.3d 364, 371 (6th Cir. 2008) (citations omitted). "[T]he

officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably

prudent man in the circumstances would be warranted in the belief that his safety or that of others

was in danger." *Terry*, 392 U.S. at 27.

## C. The District Court's Factual Determinations

Smith primarily takes issue with the district court's factual findings, arguing that the district

court's reliance on Ovalle's testimony was clear error because the district court found that his

testimony on one issue was unreliable. Specifically, the district court rejected Ovalle's testimony

that after turning the corner he saw Smith receiving keys from Banks, ordered Banks to stop, and

Smith ignored the order and ran into the apartment building and up the stairs, with Ovalle only

catching up to Smith at the top of the third floor. R. 25, Order Denying Motion to Dismiss, at 3–4.

The district court found this testimony to be "unpersuasive" for three reasons: 1) given Smith's size

it was not plausible that Smith could outrun Ovalle and then scale three flights of stairs out of

Ovalle's sight; 2) these events were not recorded in the police report; and 3) given the short distance

between the courtyard and the apartment building, it was more likely that Smith, knowing he had a

gun and that police officers were moving toward him, went immediately to the door of the apartment

building. *Id*. at 4–5. Because the district court rejected this testimony, Smith argues that the district

court should have rejected two other aspects of Ovalle's testimony: 1) Ovalle's testimony that he believed that Smith sought to evade the officers after making eye contact with them in the courtyard; and 2) Ovalle's testimony that he believed Smith was reaching for his waistband in the apartment building. We find Smith's argument to be unavailing for several reasons.

First, the surveillance video supports Ovalle's testimony regarding Smith's reaction to the officers' arrival. The video clearly shows that Smith and Banks were engaged in a serious argument, and that Smith prevented Banks from walking away on several occasions. Then, the video shows Smith making a double take to his left, at which point the argument abruptly ends, and Smith and Banks immediately walk away in the opposite direct. Seconds later, from the same direction of Smith's double take, the officers come jogging into the picture. Furthermore, Gomillion offered testimony that was entirely consistent with Ovalle's testimony, and the sequence of events portrayed in the video: "That's when we observed the defendant and a female arguing. When they saw us, they turned and walked away, and that's when we went and followed them, because they matched the description given by Sergeant Drew over the radio." R. 40, Suppression Hearing Tr., at 72. We cannot discern any inconsistency between the testimony of the two officers and our own observation of the surveillance video.

Second, there is no indication that the district court found that Gomillion lacked credibility, and Gomillion's testimony regarding Smith reaching for his waistband in the apartment building was consistent with Ovalle's testimony. Smith's only counter argument is that the district court should have rejected both officers' testimony because it is unbelievable that the officers would have waited to frisk Smith until they took him outside if they actually believed that he was reaching for his

waistband. We do not find that the officers' explanation was so incredible. As the district court explained, the officers had good reason to take Smith outside:

> [The officers] decided to walk the Defendant downstairs and outside prior to conducting the pat-down to minimize potential risks associated with conducting a search of the Defendant in a hallway outside the apartment that he was attempting to enter and to alert other officers to their location. Had they stayed in this location outside apartment 144, the officers could have had to subdue the Defendant while potentially dealing with other occupants of the apartment complex such as the Defendant's friends and neighbors and they could have potentially faced a dangerous situation while situated in very tight quarters.

R. 25, Order Denying Motion to Suppress, at 13. Further, as counsel for Smith conceded at oral argument, because Smith's hands were cuffed behind his back, he would have been unable to reach the handgun that was located in the front of his waistband. Given the context of this fast series of events, it was reasonable for the officers to believe that the best course of action was to take Smith to an open area where other responding officers would easily find them.

In sum, Smith has not provided any compelling reasons for rejecting the district court's factual findings that were rooted in the district's judgment that Ovalle and Gomillion gave credible and consistent testimony on these matters. In our view, the district court's rejection of a portion of Ovalle's testimony does not suggest error, but rather demonstrates that the district court carefully weighed and considered the credibility of the officers' testimony as a whole. "In the absence of a clear basis in the record for rejecting the district court's credibility determinations [this Court is] bound by those determinations." *Hudson*, 405 F.3d at 442. Accordingly, we adhere to our long practice of declining to reverse "findings of fact anchored in credibility assessments." *Id.* at 442.

**D. Whether the Officers had a Reasonable Suspicion**

Smith also maintains that the officers lacked a reasonable suspicion that Smith was involved in criminal activity or armed and dangerous at the time he was apprehended and searched. "We determine whether reasonable suspicion existed at the point of seizure [ ] not . . . at the point of *attempted* seizure." *McCauley*, 548 F.3d at 443 (emphasis in original). An individual is seized for Fourth Amendment purposes when an officer uses physical force or a show of authority to terminate or restrain that individual's freedom of movement. *See Brendlin v. California*, 551 U.S. 249, 254 (2007). While there seems to be some question about whether the officers ordered Smith to stop outside of the apartment building, it is undisputed that Smith was first seized when he was apprehended outside the door to the apartment. Thus, the dispositive question before us is whether the officers had a reasonable suspicion that Smith was armed and engaging in criminal activity at the point that they subdued Smith. We find that a number of factors, viewed in the totality of the circumstances, created such a reasonable suspicion.

*First*, the officers were responding to a report of a domestic dispute that was somewhat physical in nature. *See Campbell*, 549 F.3d at 371 (noting that dispatch information received by an officer is relevant to the totality of the circumstances). Although the dispute did not rise to the level of an assault, the report from Drew, and the officers' own observations, certainly gave the officers reason to investigate the dispute and Smith .

*Second*, the officers were responding to an area with a history of serious and frequent crime. As the district court noted:

> The area in question was known to the responding officers to be a high crime area. In the month prior to this incident, there had been more than 20 armed robberies in which firearms were brandished. Shootings occur often and homicides have taken place in the area. Both the sale and the use of narcotics are common in the immediate vicinity of this location and concealed firearms are frequently recovered from suspects.

R. 25, Order Denying Motion to Suppress, at 2 n.1. Smith responds that the "heightened criminality of the neighborhood is a non factor in this case." In doing so, Smith correctly notes that his presence in a high-crime area, on its own, cannot provide the basis for a reasonable suspicion. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). However, the Supreme Court has unequivocally held that the fact that the investigative stop "occurred in a 'high crime area' [is] among the relevant contextual considerations in a *Terry* analysis." *Id*. (citation omitted). Smith also argues that the high-crime nature of the neighborhood should be discounted because the incident took place "in the early afternoon of Inauguration Day in 2009." This Court has certainly noted that suspicious behavior that occurs at odd times, like the middle of the night, heightens the level of suspicion, s*ee, e.g.*, *United States v. See*, 574 F.3d 309, 314 (6th Cir. 2009); *United States v. Johnson*, 246 F. App'x 982, 986 (6th Cir. 2007), but it does not necessarily follow that Smith's presence in a high-crime area was rendered irrelevant because it was the middle of the day, particularly because Ovalle testified that criminal behavior occurred in this area during the daytime hours, R. 40, Suppression Hearing, at 28. Thus, the high-crime nature of this neighborhood is a relevant factor to the *Terry* analysis.

*Third*, Smith's reaction to the approaching officers supported a reasonable suspicion. "The Supreme Court has explained that 'nervous, evasive behavior is a pertinent factor in determining reasonable suspicion.'" *United States v. Caruthers*, 458 F.3d 459, 466 (6th Cir. 2006) (quoting

*Wardlow*, 528 U.S. at 124). Indeed, "obvious attempts to evade officers can support a reasonable suspicion." *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975). Further, "flight is not the only type of nervous, evasive behavior." *Id*. "Furtive movements made in response to a police presence may also properly contribute to an officer's suspicions." *Id*. (collecting cases). Likewise, "the abruptness . . . of a suspect's departure upon noticing the police" is a factor that may contribute to an officer's reasonable suspicion. *United States v. Johnson*, 620 F.3d 685, 694 (6th Cir. 2010); *see also Lee v. Hefner*, 136 F. App'x 807, 811 (6th Cir. 2005) (noting the officer likely had reasonable suspicion under *Wardlow* when the officer was patrolling in a high-crime area and noticed that the individual "turned about twice" when the officer approached). Smith argues that there was nothing suspicious about his behavior because he and Banks simply walked out of the courtyard at a "conversational gate, apparently oblivious to the approaching officers." Indeed, if his behavior was as described, then perhaps we would agree that Smith's behavior should irrelevant to the *Terry* analysis. *See United States v. Pearce*, 531 F.3d 374, 383 (6th Cir. 2008); *Caruthers*, 458 F.3d at 466 (noting that the "speed of the suspect's movements may be relevant in the totality of the circumstances"); *United States v. Patterson*, 340 F.3d 368, 372 (6th Cir. 2003) (holding that the act of simply walking away from police officers—who were responding to a general complaint about drug dealing—is insufficient to provide the police with reasonable suspicion). However, Smith's description of his reaction to the police presence is contradicted by the officers' testimony, and our own view of the surveillance video. Smith's reaction to the police presence was abrupt, furtive *and* evasive. Smith, upon noticing the officers, abruptly ended the argument, seemed to furtively alert Banks to the officers' presences and then walked away from the approaching officers. Further, the

district court found that once Smith reached the apartment building, he *ran* up the stairs away from the officers. R. 25, Order Denying Motion to Dismiss, at 5. Because the most reasonable interpretation of Smith's behavior was that he wanted to avoid the officers, we find that this behavior is pertinent to the *Terry* analysis.

*Fourth*, when the officers finally confronted Smith outside of the apartment door, Smith made a movement toward his waistband that both officers interpreted as reaching for a weapon, or perhaps contraband. Furtive movement toward the waistband is consistent with an attempt to either conceal or retrieve a weapon or contraband. *See Pearce*, 531 F.3d at 382 (noting that hunching and reaching for the small of the back upon seeing the police provides an officer with reasonable suspicion that the individual has a weapon or contraband); *Caruthers*, 458 F.3d at 467 (noting that suspicious arm movement can indicate an attempt to conceal contraband or to reach for a weapon). "We have recognized the importance of allowing police officers to draw reasonable inferences from their observations in light of their specialized training and experience." *United States v. Jones*, 562 F.3d 768, 776 (6th Cir. 2009). Here, the officers' belief that Smith was possibly reaching for a weapon was reasonable given the officers' belief that Smith was attempting to evade the officers and because this behavior occurred in a high-crime area where individuals often carry concealed weapons. *See Pearce*, 531 F.3d at 383 (noting that high-crime nature of the neighborhood makes furtive hand movements even more suspicious).

These factors, culminating with the officers' belief that Smith was reaching for a weapon, were sufficient to create a reasonable suspicion that Smith was engaged in criminal behavior and possibly armed and dangerous. When, as here, the totality of the circumstances suggest "the possible

presence of a firearm in a confrontational setting," an officer has little choice but to respond with "an immediate show of authority to neutralize potential danger and conduct further investigation." *Jones*, 562 F.3d at 776. Accordingly, we find that the officers had a reasonable suspicion sufficient to conduct a *Terry* stop and frisk of Smith.

### III. Conclusion

For these reasons, we **AFFIRM** the district court's denial of the motion to suppress evidence.