*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 11a0166p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
                    *Plaintiff-Appellee,*

          *v.*                                       No. 08-5374

FREDRICK MAYS,
                    *Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 07-20034—Samuel H. Mays, Jr., District Judge.

Decided and Filed: June 29, 2011

Before: MARTIN, NORRIS, and SILER, Circuit Judges.

_____

**COUNSEL**

**ON BRIEF:** Needum L. Germany, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Memphis, Tennessee, for Appellant. R. Matthew Price, ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for Appellee.

_____

**OPINION**

_____

ALAN E. NORRIS, Circuit Judge. Defendant Fredrick Mays appeals from the denial of his motion to suppress evidence of a firearm seized during an encounter with Memphis police officers. He was charged in a one-count indictment with being a felon in possession of a firearm. 18 U.S.C. § 922(g). After his motion to suppress was denied, he requested a bench trial, agreeing to stipulate to all of the elements of the offense while maintaining his right to appeal. The sole issue on appeal is whether the arresting officers

1

had the requisite reasonable suspicion to conduct a *Terry* stop and search of defendant's person. *See Terry v. Ohio*, 392 U.S. 1 (1968).

**I.**

The district court held a hearing on defendant's motion to suppress on August 6, 2008. Three police officers who were then members of the Memphis Police Department's Organized Crime Unit ("OCU") testified at the hearing: Paul Castilo, Kimberly Houston, and Brian Jones. Defendant also testified.

According to the officers, on August 6, 2007, they received an anonymous tip that a black male was selling drugs in front of an apartment complex located at 2884 Filmore.[1] The officers and other members of the OCU drove to the complex in unmarked police vehicles. They wore "turnout gear" that had the word "POLICE" written on the front and back of their shirts. When the officers initially passed the apartment complex, they saw defendant, a black male, standing on top of a stairway, overlooking a balcony or breezeway. At least two other individuals were also present at the complex. The officers continued down the street, turned around and drove back; two police vehicles then pulled up to the complex. At this time, defendant walked down the stairway and toward the police vehicles. The officers believed defendant was approaching them to sell drugs. Officers Castilo and Houston exited their vehicles and began to approach defendant. At this point, defendant appears to have realized they were police. Castilo recounted:

> [W]hen he recognized us as the police, it was just like a deer at headlights. He looked scared, nervous, twitching. He didn't know what to do, if he wanted to run, or if he wanted to stand there and wait for us.

Suppression Hearing Transcript at 11.

---

[1] The officers' accounts slightly differed on what information was relayed. Castilo, who subsequently made the *Terry* stop, recalled the tip stating a black male was selling drugs, while Jones believed that several young men were selling drugs. Houston did not receive a description of any suspects.

Defendant then put his hands in his pockets, and according to Houston, started "digging" in them. He also began to turn away from the officers and appeared to be deciding whether to run away. He was wearing loose-fitting clothing and the officers could not tell if he had a weapon. The officers became concerned for their safety and ordered defendant to remove his hands from his pockets. Defendant did not comply, continued "digging" into his pockets, and also reached into his waistband. Castilo then detained defendant and conducted a protective search which recovered a loaded .45 caliber semi-automatic pistol from defendant's waistband. While being escorted to a police vehicle, defendant began to kick and curse and asked the officers to kill him because he did not want to go back to jail. A chemical agent was used to restrain him. A subsequent search at the police vehicle discovered 1.1 grams of crack cocaine in his pants pocket. The entire incident took place between 8:30 and 10 p.m.

Defendant's story differed. He stated that he was never on the second floor of the complex, but rather had been on the first floor doing laundry. He claims the officers ran up to him, grabbed and searched him, initially found drugs, and then found the firearm when he was being escorted to a police vehicle. The district court did not credit his testimony.[2]

After the suppression hearing, the district court permitted counsel to file post-hearing memoranda. The district court subsequently issued an oral decision. Its finding of facts largely tracked the officers' testimony. The court found reasonable the officers' belief that the defendant initially approached them to sell drugs:

> The first conclusion they drew was that he [defendant] was approaching them to sell drugs. Whether that is an accurate conclusion, I don't know . . . . I can't get inside the defendant's mind, and the

---

[2]The district court explained its reasoning:

"There was no reason for them [the police] to single him [defendant] out, run up to him with his laundry. He was coming from the laundry room and they grabbed him. They didn't push him down. They ran toward him and they grabbed him. He never walked toward them. That was his testimony . . . . And I don't find that believable. Everybody has to make his own decisions about what the facts are, and those are mine."

Suppression Hearing Ruling Transcript at 42.

officers obviously couldn't either. They merely speculated as to what he might be thinking. But it is extremely important in terms of their reactions, and what they reasonably believed had occurred, or was occurring . . . .

 . . . .

They concluded that they were in the middle of perhaps a drug arrangement. And then after the defendant appeared to them to recognize them, to see who they were, they inferred that his nervousness, his twitching, his freezing, his being like a deer in the headlights, was caused by his sudden realization that they were police officers. That is what they concluded.

Was that a reasonable conclusion? I believe it was, although it may not have been an accurate conclusion.

Suppression Hearing Ruling Transcript at 13-15.

The district court also emphasized that defendant dug his hands into his pockets, which it characterized as "furtive" movements:

So, Mr. Mays had approached these individuals and they had approached him. And at some point, he started putting his hands into his pockets. . . . [O]n several occasions several of the officers told Mr. Mays to stop. Told him to take his hands out of his pockets, because under the overall circumstances, they were concerned. And he refused to do so.

At that point, the individuals, several of the officers and the defendant were in relatively close proximity. . . . [T]here is general agreement at this . . . . At least the officers seem to be in agreement, that the defendant was putting his hands in his waistband, in his pockets. It is not a matter of his slipping his hands in his pockets and casually standing there. He was making what the Court would characterize as flirted [sic] movements. And he wouldn't stop. He wouldn't either take his hands from his pockets consistently, or stop making these movements. Officer Houston referred to it several times as digging, that he was digging in his pockets as if he were reaching for something, or trying to get something.

 . . . .

> [I]t was certainly her [Officer Houston's] perception that he was being evasive and was not responding to the officer's commands . . . . And the concern was that he could have a weapon, and specifically a weapon in his waistband or in his pocket.
>
> And so we've gone from a defendant who was calm and walking forward to one who was nervous, pulling his hands in and out, reaching about, and so forth.

*Id*. at 15-17.

The district court concluded that under the totality of the circumstances the officers' suspicions that the defendant was armed and a danger to them was reasonable:

> I'm just looking, of course, at what was known to the officers at the time that these reasonable inferences had to be drawn at the time of the stop. I'm not requiring that they be clairvoyant. They were making what I would characterize as a reasonable investigatory stop, based on the facts that I've stated. And they felt that they had to protect themselves from attack. And they were justified, I think, in believing that based upon the behavior of the individual that they were investigation [sic]. He was within close range. They believed there was a possibility to be armed, that he might be armed. And then they engaged in what I would characterize as a limited search, not to discover evidence of a crime. That is not what they were about at all, as I read this record. As I find these facts, they were simply concerned with their own safety.

*Id*. at 22-23.

In rejecting the motion to suppress, the court also stated that "to come out another way, I could put the whole police force at risk." *Id*. at 32. Thereafter the district court imposed a sentence of seventy-seven months of imprisonment and a term of two years' supervised release.

## II.

In reviewing a district court's decision on a motion to suppress, we review factual findings for clear error and the application of the law to those findings de novo. *United States v. Garcia*, 496 F.3d 495, 502 (6th Cir. 2007). For *Terry*-stop analysis in particular, we recognize that "the district court is at an institutional advantage, having

observed the testimony of the witnesses and understanding local conditions, in making this determination." *United States v. Caruthers*, 458 F.3d 459, 464 (6th Cir. 2006). We consider the evidence in the light most favorable to the government. *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003).

Officers may conduct a "reasonable search for weapons for the protection of the police officer" when they have reason to believe that they are "dealing with an armed and dangerous individual." *Terry*, 392 U.S. at 27. "In evaluating an investigatory *Terry* stop, this court engages 'in a two-part analysis of the reasonableness of the stop. . . . We first ask whether there was a proper basis for the stop' and, if the stop was proper, 'then we must determine whether the degree of intrusion . . . was reasonably related in scope to the situation at hand.'" *United States v. Smith*, 594 F.3d 530, 536 (6th Cir. 2010) (quoting *Caruthers*, 458 F.3d at 464). "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). The officers must be able to articulate more than an inchoate and unparticularized suspicion or hunch. *Id.* at 123-24 (citing *Terry*, 392 U.S. at 27). This determination is made in light of the totality of the circumstances. *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

In this case the totality of the circumstances are as follows: 1) the detention and search occurred at a location where officers had been recently informed that a black man was selling drugs; 2) defendant initially approached the officers in a calm way, but his demeanor subsequently changed once he realized they were police; 3) defendant acted nervously, "like a deer at headlights"; 4) defendant turned away from the officers as if to leave; and 5) defendant frantically dug his hands into his pockets and would not remove them.

These circumstances are remarkably similar to *United States v. Pearce*, 531 F.3d 374 (6th Cir. 2008). In *Pearce*, the police swept an area associated with narcotics trafficking. Defendant, upon seeing an officer, turned to face him "hunched over a little

bit . . . stuck his right hand into the small of his back at his waistline," and slowly began backing away from the officer. *Id.* at 377-78. The officer thought defendant was trying to pull out or put something into his pants. Fearing that the defendant might have had a weapon that he was getting ready to fire, the officer drew his own weapon, ordered defendant to show his hands, and subsequently searched him. *Id.* at 377-78. We held that the officer's actions were proper because he had a reasonable suspicion that "his safety or that of others was in danger." *Id.* at 382 (quoting *Terry*, 293 U.S. at 27). While defendant's actions may have had an "innocent explanation," it was reasonable for the officer to conclude that defendant may have been attempting to conceal a weapon, particularly considering his presence in an area known for criminal activity. *Id.* at 382-83.

Both *Pearce* and our current case involve defendants who engaged in furtive movements that caused officers to fear for their safety. We note a possible distinction between *Pearce* and this case: in *Pearce* defendant slowly retreated from the officers while here defendant stood his ground.[3] But that distinction has little merit; as far as the officers' safety is concerned, a nervous defendant who is "digging" into his pants for a weapon could be more dangerous than one that is attempting to leave the scene.

As noted by the district court, its decision is also supported by *Caruthers*, 458 F.3d at 462-63 (defendant panicked, fled from police, and made a furtive movement to plant his gun beside a wall));[4] *United States v. Bohannon*, 225 F.3d 615, 616 (6th Cir. 2000) (defendant placed hand in pocket and acted "very nervous")*; United States v. Lane*, 909 F.2d 895, 896-97 (6th Cir. 1990) (defendant fled from police officers and repeatedly attempted to reach into his pockets when being searched); *see also United States v. Brown*, 310 F. App'x 776, 781 (6th Cir. 2009) (holding that an officer had a

---

[3]*Pearce* also occurred in a "high-crime area" while our case involved officers responding to an anonymous complaint. By themselves, these factors are not enough to justify a *Terry* stop, but we do consider them when other suspicious circumstances also exist. *See Caruthers*, 458 F.3d at 465, 467 (stating that an anonymous tip alone is not enough to establish reasonable suspicion and cautioning against "relying too easily or too heavily" on the designation of a "high-crime area").

[4]Defendant emphasizes that he did not flee, but *Caruthers* notes that "flight is not the only type of 'nervous evasive behavior.' Furtive movements made in response to a police presence may also properly contribute to an officer's suspicions." *Caruthers*, 458 F.3d at 466.

reasonable belief that her safety was in jeopardy when defendant "was acting nervously and evasively, and . . . made a furtive gesture towards his back pocket as he tried to leave the scene").

Defendant directs us to three cases where courts held that the placing of hands into pockets did not establish reasonable suspicion. *See United States v. Patterson*, 340 F.3d 368, 371 (6th Cir. 2003); *United States v. Davis*, 94 F.3d 1465, 1468-69 (10th Cir. 1996); *United States v. Earle*, No. 3:05-00185, 2005 U.S. Dist. LEXIS 28540 (S.D.W.Va. Nov. 9, 2005). Defendant's reliance on these cases is misplaced because none involve a sudden and alarming change in defendant's demeanor. In *Patterson*, defendant placed his hands in his pockets and proceeded to walk away from the police. *Patterson*, 340 F.3d at 369-70. He did not show any signs of nervousness or make any furtive movements other than placing and keeping his hands in his pockets; there was no "digging." The police did not have a reasonable belief that he was a threat. *Davis* is similar; the defendant placed his hands in his pockets. After an officer requested he stop, defendant continued walking in the same direction, as was his right to do so. *Davis*, 340 F.3d at 1467. Finally, in *Earle*, the defendant did have his left hand inside his shirt, but took out a cell phone, defusing the potential threat. *Earle*, 2005 U.S. Dist. LEXIS 28540, at *1, 1-12. The court also emphasized that while defendant "looked wide-eyed and nervous and appeared as if he were looking for somewhere to run" he did not "exhibit any evasive behavior or gestures nor attempt to flee, and . . . sat back down when the officer asked them." *Id*. at 12.

**III.**

For the foregoing reasons, we **affirm** the denial of defendant's motion to suppress.