[Cite as *In re J.C.*, 2019-Ohio-4815.]

# IN THE COURT OF APPEALS

# FIRST APPELLATE DISTRICT OF OHIO

# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: J.C. | : | APPEAL NOS. C-180478 |
| | | C-180479 |
| | : | TRIAL NOS. 16-2328 |
| | | 17-2850 |
| | : | |
| | : | *O P I N I O N.* |

Appeals From:  Hamilton County Juvenile Court

Judgments Appealed From Are:  Reversed and Appellant Discharged

Date of Judgment Entry on Appeal:  November 22, 2019

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Alex Scott Havlin*, Assistant Prosecuting Attorney, for Plaintiff-Appellee State of Ohio,

*Raymond T. Faller*, Hamilton County Public Defender, and *Julie Kahrs Nessler*, Assistant Public Defender, for Defendant-Appellant J.C.

**ZAYAS, Presiding Judge.**

{¶1}   Following a bench trial before a magistrate, 17-year-old J.C. was adjudicated delinquent for committing an act that had he been an adult would have constituted carrying a concealed weapon.  In this appeal, J.C. challenges the stop that led to the charges against him.  We conclude that the police officer did not have a reasonable suspicion that criminal activity was afoot at the time J.C. was stopped, and therefore, the evidence that was discovered as a result of the stop should have been suppressed.  Accordingly, we vacate the trial court's judgment.

**Facts and Procedural History**

{¶2}   On April 30, 2017, J.C. was walking on a sidewalk along Sevenhills Drive with three of his friends when two Springfield Township police cruisers pulled up and blocked their path.  Two police officers exited from their cruisers and ordered the four boys to lie on the ground.  J.C. was handcuffed and searched for weapons. The officer conducting the pat-down search, Officer Pat Kemper, found a firearm in the leg of J.C.'s pants.

{¶3}   Preceding this stop and arrest, Officer Kemper had observed J.C. on three separate occasions that same day.  On the first occasion, Officer Kemper observed J.C. for a few seconds from about 25 feet away walking with a friend near Hamilton Avenue.  On the second occasion, he observed him for a couple of minutes near a Rally's restaurant, leaning up against the railing near a walk-up service window.  And, on the third occasion, just before the stop, Officer Kemper observed J.C. for approximately five seconds walking along Sevenhills Drive.  On all three occasions, Officer Kemper said J.C. appeared casual at first, but when he saw the police cruiser J.C. looked down and put his right hand on his right hip "as though he

was protecting something that was concealed in his waistband." Officer Kemper testified that this action seemed unnatural, as J.C. was not holding onto a belt or a belt loop, or grasping at anything with his hand. Officer Kemper stated that he thought to himself "the kid's got a gun in his waistband."

{¶4} Officer Kemper described the area in which he stopped J.C. as "an extremely violent neighborhood, [with] lots of gun violence." Officer Kemper was investigating an assault that took place at an apartment complex nearby. J.C. was not involved in the assault or the investigation, and Officer Kemper answered, "No" when asked whether J.C. matched the description of anyone reported to have been engaged in criminal or suspicious activity.

{¶5} After seeing J.C. the first time, Officer Kemper said to an officer also investigating the assault, Sergeant Mark Downs, that he thought J.C. had a gun and "[i]f we get a chance later on, I'd like to maybe try and find him and see what's going on with him." After seeing J.C. the second time, Officer Kemper said to Sergeant Downs, "I'm convinced that [J.C.'s] got a gun on him. He's hiding something." But Officer Kemper and Sergeant Downs were then called to investigate another incident. Sergeant Downs indicated that he and Officer Kemper should return to the area after investigating the incident to find J.C. After seeing J.C. for a third time, Officer Kemper stated that "[o]nce he got closer to me, his left arm continued swinging as it naturally would, his right arm pointed close to his hip right about the belt line, again as though he was protecting something that was concealed in his waistband." Officer Kemper, a six-year veteran of law enforcement, testified that when someone is protecting a certain area of their waistband, "it's typically to conceal an item," and "more often than not, it's going to be a firearm." Officer Kemper continued,

3

You learn from–even from me—carrying off-duty, you're constantly checking it to make sure that your shirt's over it, nobody can see it. Can you see it through the shirt? Is it sitting right, or if you don't want anybody to see it, you'll conceal it. So just from my personal knowledge of carrying a concealed weapon, I know how an individual acts when they're carrying a concealed weapon.

{¶6} Officer Kemper had never seen J.C. prior to that day. He testified that J.C. appeared to be a juvenile and looked well under the age of 21. Officer Kemper testified that the impetus for the stop was his suspicion that a juvenile was carrying a firearm—a crime in Ohio under R.C. 2923.12, which restricts carrying concealed weapons to adults aged 21 and older.

{¶7} When Officer Kemper and Sergeant Downs pulled their marked police cruisers onto the sidewalk in front of the boys' path, J.C. stepped behind a friend, bladed his body, and moved both of his hands to his right hip. Officer Kemper testified that "bladed his body" meant that J.C. turned his body about 45 degrees, so that the weapon Officer Kemper believed J.C. to be carrying on his hip would be farther away from the officers. Officer Kemper, believing this movement to be even more indicative of someone carrying a firearm, stood behind his cruiser and gave verbal commands, while Sergeant Downs drew his weapon and ordered the boys to the ground. The boys complied with the officers' commands. Officer Kemper then conducted the search.

{¶8} J.C. was charged with carrying a concealed weapon, in violation of R.C. 2923.12, and violating his probation for failing to abide by the conditions of his house arrest. J.C. filed a motion to suppress the evidence gathered from the stop. The motion was denied and the matter proceeded to a trial before a magistrate. J.C.

was adjudicated delinquent for carrying a concealed weapon and violating probation. Over objections, the juvenile court adopted the magistrate's decision. J.C. now appeals, asserting three assignments of error.

**Legal Analysis**

{¶9} We address J.C.'s assignments of error out of order. In his second assignment of error, J.C. argues that the juvenile court erred in denying his motion to suppress because the police officers did not have a reasonable and articulable suspicion to stop him. The state argues to the contrary—that the officers' stop of J.C. was valid under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

{¶10} Appellate review of a motion to suppress involves a mixed question of law and fact. *State v. Arrazzaq*, 1st Dist. Hamilton No. C-110831, 2012-Ohio-4365, ¶ 7, citing *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71. The trial court, as the trier of fact, is in the best position to resolve factual questions and to evaluate the credibility of witnesses. *Id.* The appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Id.* "The appellate court must then determine, without any deference to the trial court, whether the facts satisfy the applicable legal standard." *Id.*

{¶11} The Fourth Amendment to the United States Constitution provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated * * *." "The Fourth Amendment forbids searching a person for evidence of a crime when there is no basis for believing the person is guilty of the crime or is in possession of incriminating evidence. That prohibition is categorical and without exception; it lies at the very heart of the Fourth Amendment." *Maryland v. King*, 569 U.S. 435, 466, 133 S.Ct. 1958, 186 L.Ed.2d 1 (2013) (Scalia, J., dissenting).

{**¶12**}  "The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.' "  *United States v. Mendenhall*, 446 U.S. 544, 553, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 554, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976).  As long as the person questioned "remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification."  *Mendenhall* at 553-554.  Accordingly, not all personal interaction between police officers and citizens involves seizures of persons. "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred" within the meaning of the Fourth Amendment.  *Terry*, 392 U.S. at 19, 88 S.Ct. 1868, 20 L.Ed.2d 889, fn. 16; *see Brendlin v. California*, 551 U.S. 249, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007).

{**¶13**}  In order for a police officer to initiate the seizure of a person for an investigatory stop without violating the person's Fourth Amendment rights, the officer must have an articulable and reasonable suspicion of the person's involvement in criminal activity.  *Terry* at 21.  Such a suspicion may be based on an officer's justified belief that an individual may be "armed and presently dangerous," permitting the officer to conduct a limited protective search of the individual for concealed weapons—the so-called *Terry* stop. *Id.* at 24; *see Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

{**¶14**}  Reasonable suspicion entails a minimal level of objective justification, "that is, something more than an inchoate and unparticularized suspicion or 'hunch,'

6

but less than the level of suspicion required for probable cause." *State v. Jones*, 70 Ohio App.3d 554, 556-557, 591 N.E.2d 810 (2d Dist.1990), citing *Terry* at 27; *see State v. Carter*, 69 Ohio St.3d 57, 66, 630 N.E.2d 355 (1994) (concluding that a police officer's inarticulate hunch will not provide a sufficient basis for an investigative stop). "A police officer may not rely on good faith and inarticulate hunches to meet the *Terry* standard of reasonable suspicion." *Jones* at 557.

{¶15} The determination of whether an officer had reasonable suspicion to conduct a *Terry* stop must be based on the totality of circumstances "viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Andrews*, 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271 (1991). An analysis of the totality of the circumstances "does not deal with hard certainties, but with probabilities." *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). A court must consider the cumulative facts "not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Id.* But, "it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Terry*, 392 U.S. at 21-22, 88 S.Ct. 1868, 20 L.Ed.2d 889.

{¶16} In this case, we begin our analysis at the point of the stop. This is not an instance in which police officers "merely approach[ed] an individual on the street * * * by asking him if he [was] willing to answer some questions." *See Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion); *see also United States v. Young*, 105 F.3d 1, 5-6 (1st Cir.1997) (finding only a "minimally intrusive" interaction that "d[id] not trigger the protections of the Fourth

Amendment" when the police officers had pulled alongside the appellant, identified themselves as police officers, and asked "Got a minute?," to which the appellant replied, "Sure"). Here, Officer Kemper and Sergeant Downs pulled their marked police cruisers onto a sidewalk, intentionally blocking J.C.'s path. It is at this point that the officers, by means of a clear showing of physical force and authority, restrained J.C.'s liberty to walk further. *See Terry* at 19; *United States v. Camacho*, 661 F.3d 718, 725 (1st Cir.2011) (finding that appellant's initial detention constituted a seizure rather than a consensual encounter where a police officer saw appellant walking on a residential sidewalk and the officer pulled his marked Crown Victoria into a driveway ahead of him, partially blocking appellant's path). A reasonable person in J.C.'s circumstances would not "feel free to disregard the police and go about his business." (Internal quotations omitted.) *Camacho* at 725.

{¶17} In a recent Ohio Supreme Court case, the court analyzed *Terry* and cases that flowed from that decision in considering a motion to suppress where an individual was stopped in a crosswalk and searched for a gun. *See State v. Hairston*, 156 Ohio St.3d 363, 2019-Ohio-1622, 126 N.E.3d 1132. In *Hairston*, concluding the officers had a reasonable suspicion to stop Hairston—the only person found in the vicinity of the sound of gunshots—the court stated,

> First, Officer Moore personally heard the sound of gunshots—the gunshots were not faint and sounded close-by. This is not a case in which the officers relied on a radio dispatch or other secondhand information about shots being fired, *In re D.W.*, 184 Ohio App.3d 627, 2009-Ohio-5406, 921 N.E.2d 1114, ¶ 32 (2d Dist.), but one in which they heard and immediately reacted to the sound of nearby gunfire. Second, Officer Moore knew from personal experience that crime often

8

occurred at night in the area where the stop took place. Officer Moore had worked the same beat for six years. He was familiar with drug and other criminal activity near the school, and he had made arrests for illegal weapons and other crimes there in the past.

*Hairston* at ¶ 11-12. An officer's experience with criminal activity in an area and an area's reputation for criminal activity are relevant factors to the reasonable-suspicion analysis. *Id.*, citing *State v. Andrews*, 57 Ohio St.3d 86, 88, 565 N.E.2d 1271 (1991); *State v. Bobo*, 37 Ohio St.3d 177, 179, 524 N.E.2d 489 (1988). However, an individual's "presence in a high-crime or high-drug area, by itself, is insufficient to justify the stop and frisk of a person, especially when the officer indicated that the offender did nothing to make the officer worry that the offender would harm him." *State v. Millerton*, 2015-Ohio-34, 26 N.E.3d 317, ¶ 32 (2d Dist.), citing *State v. Habel*, 190 Ohio App.3d 393, 2010-Ohio-3907, 942 N.E.2d 389, ¶ 24 (2d Dist.); *see State v. Carter*, 69 Ohio St.3d 57, 65, 630 N.E.2d 355 (1994). A stop that occurs after dark is another circumstance found to be of some significance in the reasonable-suspicion analysis. *Hairston* at ¶ 12, citing *Bobo* at 179.

{¶18} Here, while Officer Kemper had six years of experience in law enforcement and was patrolling an area he said was known for gun violence, Kemper observed J.C. on three separate, rather uneventful occasions all during the daytime. Unlike *Hairston*, the officers were not immediately reacting to personally hearing the sound of gunfire nearby or personally observing activities that taken together rose to the level of reasonable suspicion.

{¶19} This case is more like a relatively recent case from this court, in which we found that no reasonable, articulable suspicion existed at the time a stop of a juvenile was initiated, *In re M.P.*, 1st Dist. Hamilton No. C-130663, 2014-Ohio-2846.

9

*M.P.* involved a juvenile who was stopped and arrested for carrying a concealed weapon. The stop was based on a police detective's hunch that M.P. had been involved in an incident involving a gun days earlier. *Id.* at ¶ 1. The police detective, Mark Longworth, had M.P. stopped as he was walking with a friend down the street. Detective Longworth testified that M.P. was wearing baggy shorts—"clothing that, according to Detective Longworth, was 'such that you could conceal a firearm,' " and demonstrated an unusual interest in a police cruiser by blading his body as the cruiser passed him. *Id.* at ¶ 4.

> **{¶20}** This court stated,

> Although the soundness of Detective Longworth's hunch of M.P. was borne out by the end result, there was no evidence that at the time of the stop M.P. was presently involved in a criminal activity. Detective Longworth, who had been watching M.P for only five to ten minutes, had no basis to believe that a crime had just occurred, was occurring, or would occur soon. The fact that Detective Longworth suspected some involvement in the past incident did not create a reasonable suspicion that M.P. was presently engaged in a criminal act.

*Id.* at ¶ 11. This court ultimately found that because there was no reasonable suspicion for the stop, M.P.'s motion to suppress should have been granted.

**{¶21}** In the present case, like *M.P.*, the stop was preceded by a police officer's observation of a juvenile making an unusual physical movement upon seeing a police cruiser. And, like *M.P.*, the officer suspected the juvenile of carrying a concealed weapon. But the circumstances here involve even less ostensibly-suspicious behavior. Unlike *M.P.*, Officer Kemper did not suspect J.C. of having been involved in some past or present incident. When Officer Kemper encountered

10

J.C., an individual he had never seen before, Kemper was investigating a nearby assault and was later called off to another incident—both entirely unrelated to J.C. The only criminal act that Officer Kemper suspected J.C. of committing was carrying a concealed weapon as a juvenile. In other words, J.C.'s status as a juvenile is what made the act criminal, as carrying a concealed weapon as an adult (aged 21 or older, with the requisite permit) is legal.

{¶22} Regardless of J.C.'s status as a juvenile though, Officer Kemper's belief that J.C. was carrying a concealed weapon was based on an inarticulate hunch. Specifically, no additional facts supported Officer Kemper's theory. For example, Officer Kemper did not describe a bulge in J.C.'s pants, *see State v. Evans*, 67 Ohio St.3d 405, 618 N.E.2d 162 (1993), a metallic object, *see State v. Roberson*, 9th Dist. Lorain No. 10CA009743, 2011-Ohio-988, or the outline of a gun, *see State v. Travis*, 8th Dist. Cuyahoga No. 98420, 2013-Ohio-581. He also did not report, for instance, that he received a tip about a juvenile with a gun. *See In re Long*, 5th Dist. Stark No. 2004-CA-00377, 2005-Ohio-3825. Each time Officer Kemper saw J.C., he was described as making the *same* innocuous movement.

{¶23} Moreover, Officer Kemper's testimony on his experience with carrying a concealed weapon on his waist did not support an objective justification for the stop. He testified to his personal experience of thinking about his concealed weapon, and to his concern about how his weapon appeared to others when he attempted to keep it concealed. Officer Kemper described how he is "constantly checking" his concealed firearm, but did not describe "constantly checking" to mean that he would cover his hip in the same manner that J.C. covered his. His testimony did not describe any movement of his arms or how someone moves when they are carrying a concealed weapon.

11

**{¶24}** Additionally, Officer Kemper's testimony as to what he believed was concealed was insufficient. Officer Kemper repeatedly described J.C. as hiding *something*, but did not describe any objective details to validate his conclusion that the something that J.C. was concealing was a gun. At least in the cases cited by the dissent—for the proposition that "hand-to-waist movements are indicative of concealing a weapon"—the officers had something more to go on. *See United States v. Smith*, 427 Fed.Appx. 413, 420 (6th Cir.2011) (prior to hand-to-waist movement, appellant was seen arguing with a woman, aggressively grabbing her and preventing her from walking away on several occasions, before two police officers responded to the scene and chased the fleeing appellant through a housing complex that was known for homicides, shootings and drug activity); *United States v. Humphries*, 372 F.3d 653, 660 (4th Cir.2004) (concurrent with hand-to-waist movement—in a state where the odor of marijuana emanating from a person provided probable cause to arrest that person without a warrant in a public place—appellant was seen in a high-crime area and emanated the distinct odor of marijuana before retreating at a quick pace away from a police officer into a nearby house); *United States v. Mattes*, 687 F.2d 1039, 1041 (7th Cir.1982) (prior to hand-to-waist movement, appellant was seen in a bar wearing a gang-affiliated hat and matched the description of a suspect reported to have been involved in an earlier bar fight with a gang-member where shots were fired, and stood up and looked away when police officers entered the bar). Without more in this case, Officer Kemper's observation that J.C. looked down upon seeing a police cruiser and moved his hand to cover his hip on three separate occasions was not enough to support a particularized and objective basis for the stop.

**{¶25}** We are not disregarding that J.C. was a 17-year-old carrying a concealed weapon, and we fully appreciate the threat police officers face each day,

particularly when patrolling neighborhoods prone to gun violence. However, the Fourth Amendment does not permit officers to stop, seize, or search any person without corroborating information that the person in question is involved in criminal activity. Based on our review of the record, including Officer Kemper's testimony, the totality of the circumstances did not amount to reasonable and articulable suspicion of criminal activity for initiating a *Terry* stop. As a result, the juvenile court erred in denying J.C.'s motion to suppress. The second assignment of error is sustained.

{¶26} J.C.'s second assignment of error is dispositive of this appeal. His first and third assignments of error—challenging his arrest and probation violation—are therefore moot, and we decline to address them. The juvenile court's denial of J.C.'s motion to suppress is reversed, the judgments of the juvenile court adjudicating J.C. delinquent are reversed, and J.C. is discharged from further prosecution for these offenses.

Judgment accordingly.

CROUSE, J., concurs.
WINKLER, J., dissents.

WINKLER, J., dissenting,

{¶27} "Part of police work is investigating criminal activity that officers detect while out on patrol." *Hairston*, 156 Ohio St.3d 363, 2019-Ohio-1622, 126 N.E.3d 1132, at ¶ 18. In this case, Officer Kemper was out on patrol in the Seven Hills neighborhood—a neighborhood known for crime and gun violence—when he encountered a juvenile, J.C., on three separate occasions, over a period of several minutes, exhibiting behaviors that led Officer Kemper to believe that J.C. had a concealed firearm. Because Officer Kemper was "not required to ignore" J.C.'s suspicious behavior, and "it was reasonable and prudent" for Officer Kemper to stop

J.C. to further investigate whether he had a concealed weapon, I would overrule J.C.'s second assignment of error challenging the propriety of his stop. *See id.*

**Factual Background**

{¶28} On April 30, 2017, Officer Kemper was out on patrol in his cruiser in the Seven Hills area of Springfield Township—an area Officer Kemper described as an extremely violent neighborhood, with lots of gun violence. On the day in question, the neighborhood had recently experienced two shootings where a house and a vehicle had been struck, as well as numerous robberies. Officer Kemper had just received a call requesting aid for a domestic-violence incident, when he noticed J.C., who he perceived to be a juvenile, and his companion. J.C. was walking at a relatively fast pace, with both arms swinging. When J.C. observed Officer Kemper's car, J.C.'s right hand immediately went to his right hip, but his left arm kept swinging. Officer Kemper noted that J.C.'s hand was not grasping at a belt or belt loop on sagging pants, but that J.C. was "covering something" on his right hip. J.C.'s behavior struck him as unnatural, and he informed Sergeant Downs that he believed J.C. had a gun, and that he would like to find him later to investigate. The officers had an urgent matter, however, and the two responded to the domestic-violence call.

{¶29} Once the officers had handled the call, Officer Kemper drove past a Rally's restaurant where he saw J.C. leaning up against a railing with both of his hands open, down, and relaxed by his side. When J.C. saw Officer Kemper's car, J.C.'s right hand again went to his right hip. Officer Kemper noted that J.C. was not grabbing anything, but that he "seemed to be protecting something in his waistband." At that time, Officer Kemper once again received another call for a priority run in the Seven Hills neighborhood.

{¶30} After Officer Kemper and Sergeant Downs handled the priority run, they returned to the area where they had seen J.C. last. The officers found J.C. walking with three other juveniles in a plaza parking lot in the area of a Sunoco gas station. Officer Kemper parked on Sevenhills Drive and waited at the end of the plaza parking lot. Officer Kemper saw J.C. walking naturally. Once J.C. got closer to the cruiser, J.C.'s left arm continued swinging naturally, but his right arm was pointed close to his hip at the beltline, as though he was protecting something.

{¶31} Officer Kemper testified that his professional experience as a six-year veteran law-enforcement officer had taught him that when someone protects a certain area of their waistband, more often than not, the person has a concealed firearm. Officer Kemper also testified that when he carries his firearm off duty, he tries to conceal his firearm with his shirt, so he had personal experience with how an individual acts when carrying a concealed weapon.

{¶32} After witnessing J.C. reach for his right hip for a third time, Officer Kemper and Sergeant Downs decided to stop J.C. Officer Kemper pulled his vehicle onto the sidewalk to block J.C.'s path, and he exited from the vehicle. Sergeant Downs pulled behind Officer Kemper. J.C. stepped behind another juvenile, which made it difficult for Officer Kemper to see him. Officer Kemper then saw J.C. "blade" his body, meaning J.C. turned the right side of his body 45 degrees away from the officers. Both of J.C.'s hands then went to his right hip around the waistline area where Officer Kemper believed J.C. had a gun. At this point, Officer Kemper thought J.C. was pulling a gun. Officer Kemper got behind his cruiser and started shouting orders. Sergeant Downs approached from a different angle, with his weapon drawn, and ordered all four juveniles to the ground.

15

**{¶33}** Once the juveniles were safely on the ground, Officer Kemper conducted a pat down of J.C.'s outer clothing. Officer Kemper felt a large, hard object by J.C.'s ankle that Officer Kemper recognized as a firearm. Officer Kemper retrieved the firearm, which was a Ruger .375 Magnum revolver. The revolver was loaded with five rounds. J.C. also had three additional ammunition rounds in his pocket.

**{¶34}** J.C. moved to suppress the firearm and ammunition that Officer Kemper retrieved from his person. J.C. argued that the evidence was found as part of an unlawful stop.

### Law and Analysis

**{¶35}** Fourth Amendment jurisprudence has long recognized the government's interest in "effective crime prevention and detection; [and] it is this interest which underlies the recognition that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Terry*, 392 U.S. at 22, 88 S.Ct. 1868, 20 L.Ed.2d 889. Therefore, "police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), quoting *Terry* at 30. "In allowing such detentions, *Terry* accepts the risk that officers may stop innocent people. Indeed, the Fourth Amendment accepts that risk in connection with more drastic police action; persons arrested and detained on probable cause to believe they have committed a crime may turn out to be innocent." *Illinois v. Wardlow*, 528 U.S. 119, 126, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000).

{¶36} As the Ohio Supreme Court has recently reiterated, no precise definition exists for the reasonable-suspicion standard. *See State v. Hawkins*, Slip Opinion No. 2019-Ohio-4210, ¶ 20. "The reasonableness of a *Terry* stop 'depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.' " *Id.*, quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). "The level of suspicion required to meet the reasonable-suspicion standard 'is obviously less demanding than that for probable cause,' and 'is considerably less than proof of wrongdoing by a preponderance of the evidence' but is 'something more than an "inchoate and unparticularized suspicion or "hunch." ' " *Hawkins* at ¶ 20, quoting *Sokolow* at 7, quoting *Terry* at 27.

{¶37} Courts reviewing whether an officer had reasonable suspicion of criminal activity must "allow[] officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.' " *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002), quoting *Cortez*, 449 U.S. at 418, 101 S.Ct. 690, 66 L.Ed.2d 621.

{¶38} Although the majority correctly cites to *Terry* in analyzing this case, the majority misapplies it. In determining that Officer Kemper lacked reasonable suspicion to conduct an investigative stop of J.C., the majority erroneously relies on our decision in *In re M.P.* Although *M.P.* and this case both involve investigative stops of juveniles carrying concealed firearms, the similarities between the facts of the cases end there. In *M.P.*, M.P. had been a witness to a crime in which an unknown person fired a gun at a victim. Based on this incident, a detective began surreptitiously watching M.P. Two days after the shooting incident, the detective

17

secretly monitored M.P. as he was walking along the street. The detective noted that M.P. had on baggy shorts, and that he demonstrated an interest in a passing police car. Based on these observations alone, the detective called for uniformed officers to initiate a stop. The *M.P.* court determined that the detective's actual impetus for stopping M.P. was the earlier shooting incident, and that there was nothing unusual about baggy shorts and taking an interest in a passing police car. Therefore, the *M.P.* court determined that the detective had no objective reason to believe that M.P. presently had a gun.

{¶39} In this case, unlike *M.P.*, Officer Kemper had no ulterior motive in stopping J.C. Officer Kemper had not been monitoring J.C. based on an earlier crime, and the record does not reflect that Officer Kemper had ever encountered J.C. before this incident. Unlike *M.P.*, this case is not just about a juvenile wearing baggy pants and turning to look at a police car. Initially, Officer Kemper witnessed J.C. walking in a natural manner. Officer Kemper then witnessed J.C. place his right hand to his right hip as soon as he saw Officer Kemper's police cruiser—and this did not happen just once, or even twice, but three separate times. Officer Kemper was clear that J.C.'s hand was not grasping at a belt loop in an effort to hold up his pants, but he was "covering something." Officer Kemper also noted that J.C. appeared to be a juvenile. *See* R.C. 2923.12.

{¶40} Officer Kemper testified that he was familiar with J.C.'s unnatural behavior because, in his experience as a six-year veteran officer, when a suspect protects a certain area of their waistband, that suspect is more often than not concealing a weapon. Officer Kemper also testified that when he carries his firearm off duty, he constantly checks to make sure that his shirt covers his gun so that no one can see it.

18

**{¶41}** The majority in reaching its result gives little weight to Officer Kemper's testimony that he recognized J.C.'s unnatural hand-to-waist movements based on his experience as a six-year veteran in law enforcement and also based on his own experience as an off-duty police officer carrying a concealed weapon. The majority affords no weight to this portion of Officer Kemper's testimony because it pertained to his "personal experience." An officer's personal experience is relevant to any reasonable-suspicion inquiry. *See Arvizu*, 534 U.S. at 273, 122 S.Ct. 744, 151 L.Ed.2d 740. Officer Kemper testified not just to his experience as an off-duty police officer carrying his weapon, but also as to his professional experience as a six-year veteran officer. This court "must give due weight to [Officer Kemper's] experience and training and view the evidence as it would be understood by those in law enforcement." *See Andrews*, 57 Ohio St.3d at 88, 565 N.E.2d 1271.

**{¶42}** Case law further supports Officer Kemper's factual inference that hand-to-waist movements are indicative of concealing a weapon, especially when those movements are the product of police presence. *See Smith*, 427 Fed.Appx. at 420 ("Furtive movement toward the waistband is consistent with an attempt to either conceal or retrieve a weapon or contraband."); *Humphries*, 372 F.3d at 660 ("[A]s the police officers approached in their marked patrol car, [the suspect] patted his waist, which [the officer] interpreted as a 'security check,' an instinctive check by [the suspect] to see that his weapon was in place."); *Mattes*, 687 F.2d at 1041 (person's action in turning away and moving hand toward waist upon seeing police is "consistent with reaching for a gun.").

**{¶43}** Therefore, the majority's determination that J.C.'s hand-to-waist movements upon seeing police were "innocuous" is not supported by Officer Kemper's testimony or the law.

{¶44} This is not a case of police arbitrarily interfering with a juvenile's personal security. The fact that the officers showed no suspicion towards J.C.'s companions bolsters this fact. An average citizen, without Officer Kemper's experience and training, may find J.C.'s hand-to-waist movements innocuous when viewed in a vacuum. Officer Kemper's personal experience indicated to him that J.C.'s unnatural hand movements upon observing a police cruiser were consistent with concealing a weapon. Officer Kemper's interpretation of J.C.'s behavior, along with the character of the neighborhood, and the fact that J.C. is a juvenile, amounts to reasonable suspicion of criminal activity. Therefore, Officer Kemper was justified in stopping J.C. to investigate further.

{¶45} Furthermore, I would hold that the officers' use of force was a reasonable extension of the *Terry* stop in this case. An officer's use of force during an investigative stop does not automatically transform the stop into an arrest where the officer's use of force is reasonable under the circumstances for personal safety. *Hairston*, 156 Ohio St.3d 363, 2019-Ohio-1622, 126 N.E.3d 1132, at ¶ 21. Officer Kemper initiated J.C.'s stop by using his police cruiser to block J.C.'s egress, and Officer Kemper stepped out of his vehicle. J.C. then stepped behind another juvenile, and he "bladed" his body, which Officer Kemper described as J.C. turning his body away from Officer Kemper. Officer Kemper then saw J.C. place both of his hands to his right hip—the same area where Officer Kemper believed that J.C. had a concealed weapon. Fearing for his safety, Officer Kemper positioned himself behind his cruiser, and Sergeant Downs pulled his weapon and ordered J.C. and the group of juveniles to the ground. Ultimately, J.C. did have a concealed weapon.

20

**{¶46}** For the foregoing reasons, I would uphold the trial court's decision overruling J.C.'s motion to suppress. I would overrule all of J.C.'s assignments of error, and affirm the judgment of the trial court. Therefore, I dissent.

Please note:

The court has recorded its own entry on the date of the release of this opinion.