[Cite as *In re A.M.J.*, 2024-Ohio-5889.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | |
| | | No. 23AP-745 |
| [A.M.J., | : | (C.P.C. No. 22JU-6462) |
| Appellant]. | : | (REGULAR CALENDAR) |

---

D E C I S I O N

Rendered on December 17, 2024

---

**On brief:** *David K. Greer*, for appellant. **Argued:** *David K. Greer*.

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Mark R. Wilson*, for appellee. **Argued:** *Mark R. Wilson*.

---

APPEAL from the Franklin County Court of Common Pleas
Division of Domestic Relations, Juvenile Branch

BOGGS, J.

{¶ 1} Appellant, A.M.J., appeals the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, which overruled his objections to a magistrate's decision and adjudicated him a delinquent minor for committing the offense of carrying a concealed weapon. In particular, A.M.J. challenges the trial court's denial of his motion to suppress evidence, which he maintains the state obtained in violation of his rights under the Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution. For the following reasons, we affirm the trial court's judgment.

## I. FACTS AND PROCEDURAL BACKGROUND

{¶ 2} On June 28, 2022, shortly after 1:00 a.m., Columbus Police Officer, Adam Kelker, and several other officers responded to a dispatch about a suicidal person at an address on East 26th Avenue, between Cleveland Avenue and Billiter Boulevard, in

Columbus. The caller had explained that her husband was having suicidal thoughts and had left the house in a car. Officers were able to speak with the husband by cell phone, and they attempted to discern his location.

{¶ 3} Officer Kelker estimated that he was at that address for about 20 minutes. While he waited for the officer assigned to that district to wrap up the dispatch, Officer Kelker heard approximately 15 to 20 gunshots coming from the north, near his location. The officers, other than the officer who was wrapping up the dispatch, immediately ran to their cruisers and headed in the direction of the gunfire. By the time Officer Kelker reached his cruiser, Shotspotter software had identified the location of the shots as an address on Maynard Avenue, between Cleveland Avenue and Billiter Boulevard, two blocks directly north of the East 26th Street address. Officer Kelker drove east on East 26th Street and then turned north on Billiter Boulevard, toward Maynard Avenue.

{¶ 4} At the intersection of Billiter Boulevard and Duxberry Avenue, which runs parallel to and between East 26th Street and Maynard Avenue, Officer Kelker encountered two individuals on bicycles, one of whom he later identified as A.M.J., "just kind of cruising." (Jan. 4, 2023 Tr. at 18.) He estimated their ages as between 15 and 20 years old. Officer Kelker immediately recognized that the individuals—the only people he had seen on the streets—were traveling south, from the direction where the shots had been fired. He estimated the time since the shots had been fired—less than one minute—was about the time it would have taken to travel from where the shots had been fired to where he encountered the individuals.

{¶ 5} Officer Kelker initiated a traffic stop, drew his gun, and asked the individuals to show him their hands. The individuals complied, and Officer Kelker conducted a pat down for weapons, due to having just heard gunshots. While patting down A.M.J., Officer Kelker felt an object in A.M.J.'s right front pocket which he knew, based on his training and experience, to be a firearm. He then instructed A.M.J. to get on the ground, after which Officer Kelker removed the firearm from A.M.J.'s pocket, handcuffed him, and placed him in the police cruiser. While obtaining A.M.J.'s information, Officer Kelker learned that A.M.J. was 17 years old. He subsequently transported A.M.J. to police headquarters to be processed and interviewed by detectives. Throughout these interactions with Officer Kelker, A.M.J. was compliant and "very respectful." (Jan. 4, 2023 Tr. at 37.)

{¶ 6} Later that day, a complaint was filed in the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, alleging that A.M.J. was a delinquent child, based on his commission of the offense of carrying a concealed weapon, a fourth-degree felony if committed by an adult. A.M.J. denied the allegations of the complaint and later filed a motion to suppress the state's evidence as the fruit of an unconstitutional detention, frisk, and search, in violation of *Terry v. Ohio*, 392 U.S. 1 (1968).

{¶ 7} A magistrate conducted a hearing on A.M.J.'s motion to suppress, which the magistrate denied from the bench, and a trial on the delinquency complaint. The magistrate orally adjudicated A.M.J. a delinquent minor for having committed the offense of carrying a concealed weapon and scheduled the matter for a dispositional hearing. The magistrate later issued written decisions restating his denial of A.M.J.'s motion to suppress, adjudicating A.M.J. a delinquent minor for having committed the offense of carrying a concealed weapon, and imposing as a disposition a period of community supervision.

{¶ 8} A.M.J. filed objections to the magistrate's decision. As relevant here, he argued that the magistrate erred by denying his motion to suppress and that admission of evidence obtained from Officer Kelker's detention and search violated the Fourth and Fourteenth Amendments to the United States Constitution and Article I, Section 14 of the Ohio Constitution. After the transcript of the suppression hearing and trial had been prepared and filed, A.M.J. filed a supplement to his objections. The trial court overruled A.M.J.'s objections, concluding that officers had reasonable suspicion to stop and search A.M.J. and that the magistrate properly denied A.M.J.'s motion to suppress. ]

{¶ 9} On appeal here, A.M.J. asserts a single assignment of error:

> The trial court denied [A.M.J.'s] rights under the Fourth Amendment [to] the United States Constitution, and Article I, Section 14 of the Ohio Constitution, by not suppressing the fruits of this unreasonable warrantless search and seizure. Specifically, the trial court erred in relying on *State v. Hairston*[, 150 Ohio St.3d 363, 2019-Ohio-1622] when, unlike *Hairston*, officers never went to the scene of the gunshots to investigate, and simply stopped the first people they saw, two random youths riding bicycles a block away.

## II. ANALYSIS

### A. The Fourth Amendment and the Investigative Stop Exception to the Warrant Requirement

{¶ 10} The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. Article I, Section 14 of the Ohio Constitution contains language virtually identical to that in the Fourth Amendment, and the Supreme Court of Ohio has " 'harmonize[d]' * * * Article I, Section 14 with the Fourth Amendment 'unless there are persuasive reasons' for not doing so." *State v. Jordan*, 166 Ohio St.3d 339, 2021-Ohio-3922, ¶ 14, quoting *State v. Robinette*, 80 Ohio St.3d 234, 239 (1997). A.M.J. makes no argument that Article I, Section 14 affords greater protections than the Fourth Amendment, so we address his arguments through the lens of the Fourth Amendment.

{¶ 11} Searches and seizures conducted without a warrant are generally deemed unreasonable unless they fall into one of the well-defined exceptions to the Fourth Amendment's warrant requirement. *Arnold v. Cleveland*, 67 Ohio St.3d 35, 45 (1993); *State v. Gillenwater*, 10th Dist. No. 02AP-292, 2003-Ohio-1651, ¶ 24, citing *Katz v. United States*, 389 U.S. 347 (1967). One such common exception is an investigative (or *Terry*) stop. *State v. Anderson*, 10th Dist. No. 15AP-924, 2016-Ohio-7269, ¶ 9, citing *Terry* at 20-22. A police officer may conduct a brief investigative *Terry* stop that falls short of an arrest "when the officer has a reasonable suspicion based on specific and articulable facts that criminal behavior has occurred or is imminent." *State v. Hairston*, 156 Ohio St.3d 363, 2019-Ohio-1622, ¶ 9, citing *Terry* at 30. "Reasonable suspicion entails some minimal level of objective justification, 'that is, something more than an inchoate and unparticularized suspicion or "hunch," but less than the level of suspicion required for probable cause.' " *State v. Jones*, 188 Ohio App.3d 628, 2010-Ohio-2854, ¶ 17 (10th Dist.), quoting *State v. Jones*, 70 Ohio App.3d 554, 556-57 (2d Dist.1990). "An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417 (1981). When an officer who makes a lawful *Terry* stop is "justified in believing" that the individual whose behavior he is investigating "is armed and presently dangerous," the officer may also conduct a limited protective search "to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Terry* at 24; *see also Adams v. Williams*, 407 U.S. 143, 146 (1972).

{¶ 12} Whether an officer had reasonable suspicion to conduct a *Terry* stop is determined based on the totality of the circumstances, " 'viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold.' " *Hairston* at ¶ 10, quoting *State v. Andrews*, 57 Ohio St.3d 86, 87-88 (1991). The determination "must be 'based on the *collection* of factors,' " *id.* at ¶ 15, quoting *State v. Batchili*, 113 Ohio St.3d 403, 2007-Ohio-2204, ¶ 19, considered cumulatively and " 'as understood by those versed in the field of law enforcement,' " *id.* at ¶ 10, quoting *Cortez* at 148. (Emphasis sic.)

### B. Standard of Review

{¶ 13} Appellate review of a trial court's decision on a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. The appellate court must accept the trial court's factual findings if they are supported by competent, credible evidence, but it must independently decide, without deference to the trial court, whether those facts satisfy the applicable legal standard. *Id.*, citing *State v. Fanning*, 1 Ohio St.3d 19 (1982) and *State v. McNamara*, 124 Ohio App.3d 706 (4th Dist.1982). A.M.J. does not challenge the trial court's findings of fact, as he concedes, "the facts are undisputed." (Appellant's Brief at 19.) Instead, he challenges the trial court's legal conclusion that those facts satisfy the applicable legal standard—a question of law that we review de novo. *See State v. Ivery*, 10th Dist. No. 23AP-92, 2023-Ohio-3495, ¶ 32.

### C. *Hairston* Controls

{¶ 14} As the trial court aptly recognized, the facts of this case closely parallel those the Supreme Court recently addressed in *Hairston*. There, Columbus police officers responded to a dispatch about a domestic dispute. As they were getting out of their cruiser, however, they heard four or five nearby gunshots, coming from the west. The officers immediately drove toward the area from where the shots seemed to originate, around a nearby elementary school. After driving about four-tenths of a mile, the officers were approaching an intersection outside the school grounds when they saw an individual whom they later identified as Hairston walking away from the school into a crosswalk while talking on a cell phone. The officers, not seeing anyone else around, exited their cruiser with weapons drawn and ordered Hairston to stop. Officer Samuel Moore asked Hairston if he had heard the gunshots, and he confirmed that he had heard the gunshots. When Officer Moore asked Hairston whether he had a weapon, Hairston said he had a gun and nodded

toward his jacket pocket. Officer Moore patted Hairston down and removed the gun from Hairston's pocket. According to Officer Moore, Hairston had spoken calmly with the officers but had also seemed somewhat nervous. The officers arrested Hairston, and he was charged with carrying a concealed weapon.

{¶ 15} Hairston filed a motion to suppress the state's evidence obtained during the stop, arguing that the officers lacked reasonable suspicion to stop and search him, which the trial court denied. On appeal, this court reversed the trial court's judgment on Hairston's motion to suppress, finding no particularized connection between Hairston and the gunshots to give rise to reasonable suspicion, but the Supreme Court reversed our judgment. In concluding that the officers had reasonable suspicion to stop Hairston, the Supreme Court noted that Officer Moore had personally heard and immediately reacted to gunshots, which were not faint and sounded as if they were nearby. *Hairston* at ¶ 11. The Supreme Court relied heavily on the facts that "the stop occurred very close in time to the gunshots and Hairston was the only person in the area from which the shots emanated." *Id.* at ¶ 13. It summarized:

> Upon hearing gunshots, [the officers] proceeded immediately to the location they believed the shots to be coming from to investigate. Finding only Hairston in the area and knowing that criminal activity frequently occurred there, the officers were not required to ignore Hairston's presence, nor was it necessary for them to attempt to speak to him without taking precautions for their own safety. To the contrary, it was reasonable and prudent for the officers to stop Hairston to see if he was the source of or had information about the gunshots. And because the gunshots gave the officers reason to suspect that Hairston was armed, they were justified in patting him down for their safety. *Terry*, 392 U.S. at 30-31* * *; *Andrews*, 57 Ohio St.3d at 89[.]

*Id.* at ¶ 18. The Supreme Court criticized this court's focus "on individual factors in isolation rather than on the totality of the circumstances" and failure to "give any weight to the contextual factors asserted by the state," including that the stop occurred after dark. *Id.* at ¶ 15, citing *United States v. Arvizu*, 534 U.S. 266, 274 (2002).

{¶ 16} The similarities between *Hairston* and this case cannot be overstated. In *Hairston*, officers heard nearby gunshots while they were responding to a nighttime dispatch about a domestic dispute. Here, officers heard nearby gunshots while responding to a nighttime dispatch about a potentially suicidal person. In both cases, the gunshots

were seemingly unrelated to the dispatch officers were responding to. Officer Moore described the gunshots in *Hairston* as coming from the west, from the area of a school several streets away. Officer Kelker described the gunshots here as coming from the north, and the Shotspotter software located the gunshots just two blocks north of Office Kelker's location. The officers in both cases immediately drove toward the gunshots and, within one minute of hearing the shots, conducted a traffic stop of the only individual or individuals they saw in the area. Hairston and A.M.J. were both traveling away from where officers believed the shots had been fired when officers stopped them. In both cases, the officers got out of their cars with weapons drawn, conducted a pat down for weapons, and retrieved a concealed handgun, leading to charges of carrying a concealed weapon.

{¶ 17} Like *Hairston*, this is not a case in which the officers relied on a radio dispatch or secondhand information about shots being fired. In both cases, the officer who conducted the stop personally "heard and immediately reacted to the sound of nearby gunfire." *Hairston* at ¶ 11. As even Chief Justice O'Connor acknowledged in her dissent in *Hairston*, "it is a legitimate factor to consider that the sound of gunshots could imply that a crime may be happening contemporaneously at a nearby location." *Id*. at ¶ 40, fn.3 (O'Connor, J., dissenting), citing *State v. Tally-Clayborne*, 378 Wis.2d 741, ¶ 10 (2017). As to the existence of contemporaneous criminal conduct here, Officer Moore testified that it is unlawful to discharge a firearm within the City of Columbus and that, even if a shot is justified by self-defense, something illegal had to have happened to give rise to the self-defense justification.

{¶ 18} The "most important considerations" that justified the Supreme Court's determination of reasonable suspicion in *Hairston* were "that the stop occurred very close in time to the gunshots and Hairston was the only person in the area from which the shots emanated." *Id*. at ¶ 13. The same factors support a finding of reasonable suspicion here. In both cases, the stops occurred within one minute of officers hearing the gunshots, and in both cases, the individuals stopped were the only individuals the officers encountered on their way toward the suspected location of the gunshots. "[T]aken together and viewed in relation to each other," the Supreme Court held in *Hairston* that these facts, also present here, demonstrated reasonable suspicion for the stop. *Id*. at ¶ 14.

{¶ 19} A.M.J.'s efforts to distinguish *Hairston* are misplaced. First, A.M.J. argues that *Hairston* is factually distinguishable because the police in *Hairston* "traveled to the scene of the gunshots to investigate, then looked for suspects based on that investigation," whereas the officers here "never went to the scene of the gunshots." (Appellant's Brief at 2.) A.M.J. mischaracterizes the facts in *Hairston*. Although the majority opinion does state that the officers had "arrived at the location they believed the shots had emanated from— the elementary school," *id.* at ¶ 18, it also acknowledges that the officers encountered Hairston at an "intersection *outside* the school" grounds. (Emphasis added.) *Hairston* at ¶ 13. As the dissent in *Hairston* clarifies, the officers "were on their way toward" the school where they thought the gunshots had occurred when they saw Hairston walking into the crosswalk, stopped the cruiser, and detained him. *Id.* at ¶ 35 (O'Connor, C.J., dissenting). Here, Officer Kelker was likewise *on his way toward* the address the Shotspotter software had identified as the source of the shots when he saw and detained A.M.J. In any event, the officers in *Hairston* did not engage in any investigation at the supposed scene of the gunshots before stopping Hairston, as A.M.J. suggests the officers were required to do before stopping him. *Hairston* does not impose such a requirement.

{¶ 20} In both *Hairston* and this case, the police officers personally heard nearby gunshots and within about one minute, while driving toward the suspected location of the gunshots, encountered individuals who were traveling in the opposite direction and were the only people the officers had seen. In this case, the distance between the address reported by the Shotspotter software and the stop was between one-tenth and one-quarter of a mile. Even if the stop in *Hairston* occurred closer to the officer's estimation of where the gunshots were fired, that fact would not compromise the application of *Hairston* here. Officers need not bypass potential suspects walking away from the scene of a crime until after they investigate the scene itself, perhaps only to determine that everyone has fled. Consistent with the Supreme Court's opinion in *Hairston*, we conclude that "it was reasonable and prudent" for Officer Moore "to stop [A.M.J.] to see if he was the source of or had information about the gunshots." *Id.* at ¶ 18.

{¶ 21} A.M.J. also contends that there was no officer-safety concern to justify the detention and search in this case. In that regard, he notes Officer Kelker's testimony that A.M.J. and his companion were not riding their bikes in a hurried manner, that there was

no weapon in plain view, and that the officers did not have any previous knowledge of A.M.J. or any indication that he had a gun in his possession. Yet in *Hairston*, the majority held that the recent gunshots in close proximity to where the stop occurred "gave the officers reason to suspect that Hairston was armed" and that the officers "were justified in patting him down for their safety." *Id.*, citing *Terry* at 30-31 and *Andrews* at 89. Officer Moore testified that he stopped A.M.J. within one minute after hearing 15 to 20 gunshots, approximately one block from the location of the shots, as identified by Shotspotter software, and when A.M.J. and his companion were the only people visible in the vicinity. In light of those facts, Officer Kelker not only lawfully conducted an investigatory stop of A.M.J. but was also justified in patting down A.M.J. for his safety.

{¶ 22} A.M.J. also attempts to distinguish *Hairston* based on his contention that the address obtained from Shotspotter software in this case was within a residential area. But in her dissent in *Hairston*, Chief Justice O'Connor pointed out that the officers stopped Hairston in a similarly "dense residential area" and had "passed more than three dozen houses driving from the site of the domestic-dispute call to the intersection where they stopped Hairston." *Id.* at ¶ 47 (O'Connor, C.J., dissenting). Chief Justice O'Connor was concerned that, while Officer Moore may have only seen Hairston, "there were certainly numerous people in the neighborhood and, importantly, a lot of places to hide." *Id.* at ¶ 48 (O'Connor, C.J., dissenting). Yet those facts were unpersuasive to the majority, which instead held firm to its reliance on Hairston being the only person the officers observed enroute to where they believed the gunshots had originated. The residential nature of the neighborhood is no more persuasive against a finding of reasonable suspicion here than it was in *Hairston*.

{¶ 23} A.M.J. makes several other assertions in his appellate brief that are misplaced and of no relevance to our analysis. For example, A.M.J. purports to distinguish this case from *Hairston* on the basis that, prior to hearing gunshots, the police were responding to a report of criminal conduct in *Hairston* but were only conducting a wellness check in this case. But as there was no evidence in either case that the gunshots were related to the dispatches that placed the officers in the vicinity, the nature of those underlying dispatches is irrelevant. Once the officers responded to the gunshots, they were investigating independent criminal conduct. Similarly irrelevant is A.M.J.'s argument that Officer Kelker

did not conduct a gunshot residue test on A.M.J. and did not have other definitive proof that A.M.J. had recently fired a gun. We are concerned solely with whether Officer Kelker had reasonable suspicion when he initiated his stop of A.M.J. What Officer Kelker did or did not learn later can have no bearing on the existence of reasonable suspicion at the time of the stop. Finally, A.M.J. argues that the officers in *Hairston* "had prior knowledge the suspect had a gun." (Appellant's Brief at 30.) A.M.J. is apparently referring to the fact that, after officers stopped him at gunpoint but before they conducted a pat down, Hairston responded affirmatively when Officer Moore asked him if he was carrying a weapon. Again, however, the officers' conduct *after* stopping Hairston and A.M.J. cannot affect whether the officers had reasonable suspicion to justify a stop in the first place. In both cases, the officers learned that their suspect possessed a firearm only after conducting a stop.

### D. *In re J.C.* is Distinguishable

{¶ 24} A.M.J. contends that this case is more akin to *In re J.C.*, 1st Dist. No. C-180478, 2019-Ohio-4815, than to *Hairston*, and that *J.C.* supports reversal of the trial court's denial of his motion to suppress. We disagree. Not only is *J.C.*, a decision from the First District Court of Appeals, nonbinding on this court, but it is also readily distinguishable. In fact, nearly the only similarity between this case and *J.C.* is that a juvenile was charged with carrying a concealed weapon after being stopped by a police officer and subjected to a pat down. Prior to the stop in *J.C.*, one of the police officers involved in the stop had observed J.C. on three occasions that day. The officer was investigating an assault when he first observed J.C., who was not involved in the assault or the officer's investigation thereof. Each time the officer encountered him, J.C. looked down when he saw the police cruiser and put his right hand on his right waistband in an unnatural manner, as if he were protecting something concealed there. This led the officer to believe that J.C. had a gun in his waistband. Just after observing J.C. for the third time, officers pulled their police cruisers onto the sidewalk and blocked J.C., who was walking with three friends. The impetus for the stop was the officer's belief that J.C., who appeared to the officer to be less than 21 years old, was carrying a concealed firearm. The officers ordered the four boys to lie on the ground. J.C. was handcuffed and searched for weapons, and the officer who had observed J.C. throughout the day found a firearm in the leg of J.C.'s pants. The First District Court of Appeals held that the officers in *J.C.* did not have a reasonable and articulable suspicion for the stop.

{¶ 25} The most notable reason that *J.C.* is less persuasive than *Hairston* is that the search in *J.C.* did not occur in the course of officers responding to gunshots, a scenario that itself gave rise to concerns for officer safety. The First District itself distinguished the facts in *J.C.* from those in *Hairston*. After noting that the officer had observed J.C. on "three separate, rather uneventful occasions all during the daytime," it stated, "[u]nlike *Hairston*, the officers were not immediately reacting to personally hearing the sound of gunfire nearby or personally observing activities that taken together rose to the level of reasonable suspicion." *J.C.* at ¶ 18. Moreover, the officers in *J.C.* did not conduct an investigatory stop and pat down for their own protection; the reason for the stop was the officer's suspicion that J.C. was illegally carrying a concealed weapon, based on the officer's observations of J.C. throughout the day. *J.C.* does not undermine *Hairston*'s application to the facts of this case.

## III. CONCLUSION

{¶ 26} As the Supreme Court held in *Hairston*, and based on the controlling authority of that case, we conclude that Officer Kelker had reasonable suspicion to justify a warrantless investigative stop of A.M.J. and a protective pat down for weapons. Therefore, the trial court did not err by overruling A.M.J.'s motion to suppress. Accordingly, we overrule A.M.J's sole assignment of error and affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

DORRIAN and JAMISON, JJ., concur.

———————————